LEOTA GROH, Appellee, v. NELLIE MILLER et al., Appellants.

**VENDOR AND PURCHASER:** Contract With Deceased. Oral contracts with deceased persons for the purchase of real estate can be established only by *very* clear and convincing testimony.

*Appeal from Lucas District Court.*—D. M. ANDERSON, Judge.

OCTOBER 16, 1923.

REHEARING DENIED JANUARY 18, 1924.

ACTION in equity, to enforce specific performance of a parol agreement claimed to have been made with Laurel Boss, now deceased, whereby he agreed to convey to appellee his dwelling house and household goods, in consideration of services rendered by appellee to said Laurel Boss and his wife. Appellants are a niece and a nephew, the only heirs of Laurel Boss, deceased, and the administrator of the estate of Laurel Boss. This appeal is

from a decree establishing in the plaintiff the ownership of the property in controversy. Facts appear in the opinion.—*Reversed and remanded.*

*J. A. Penick*, for appellants.

*J. W. Kridelbaugh*, for appellee.

ARTHUR, J.—I. The real estate in controversy was the homestead of Laurel Boss, which was situated in the town of Chariton, in Lucas County, Iowa, and which was worth about $2,500. The household goods in the house were also in controversy. Boss and his wife had no children. Appellee and her husband moved to Chariton, and took up their residence in a rented house near the home of Laurel Boss. There were no children in appellee's family. In the spring of 1918, Mrs. Boss received some injury, and was for a long time confined to her bed. Later, Mrs. Boss received another injury, and was confined to a wheel chair or to her bed until she died, on November 16, 1920. No permanent nurse seems to have been employed to care for Mrs. Boss during her illness, and Mr. Boss appears to have depended upon himself and his neighbors to care for her. Laura Barton, niece of Mrs. Boss, and a practical nurse, was in the Boss home quite frequently for about two weeks at a time, all during the illness of Mrs. Boss, and helped in caring for her. Occasionally other relatives would remain with Mrs. Boss for a short time. Mrs. Groh, appellee, was a near neighbor and a willing helper, and rendered more service in the care of Mrs. Boss during her illness than did anyone else. Some time before Mrs. Boss died, appellee and her husband moved into a rented house, several blocks from the Boss home. After Mrs. Boss died, it is claimed by appellee, Laurel Boss, who continued to live in his homestead, agreed with appellee that, if she and her husband would move into his house and make a home for him, he would give her the property in question. About January 1, 1921, appellee and her husband moved into the Boss home. Boss reserved a room in the home, and was living there at the time of his death, on September 9, 1921. No deed was made, and no written contract of any kind was entered into. Boss died intestate. Boss

and his wife were each about 65 years old when they died. When he died, Boss owned a farm of 276 acres, located about four miles from the town of Chariton, and the residence property in controversy, and was possessed of $7,000 or $8,000 in bonds, money, and notes, and a one-half interest in some implements and stock on his farm.

The claim of plaintiff is that Laurel Boss agreed to convey to her his homestead property and household goods, in consideration of his board, care, and lodging as long as he lived; and that, in pursuance of such agreement, she took possession of said dwelling and household goods, under said verbal agreement. Appellants' position is that there was no such agreement as claimed by appellee, and that appellee and her husband were occupying the dwelling house and using the furniture therein, belonging to Laurel Boss, under a verbal rental contract with said Laurel Boss, Boss agreeing to furnish and lease to appellee and her husband said dwelling house, with the furniture and household goods contained therein, and to furnish the fuel to heat said dwelling house and some provisions, in consideration of appellee and her husband's furnishing to Laurel Boss his board and lodging in said dwelling house so long as they could mutually agree. Appellants also strenuously urge that the decree entered by the district court is not supported by sufficient proof; that the evidence offered by appellee was not of such clear, convincing, definite, and unequivocal character as is required to divest the legal title to the real estate in controversy.

II.	There is no controversy about the law. Undoubtedly, the rule is that the evidence to establish such a parol contract must be clear, convincing, and satisfactory. This rule was early laid down in this state, and has been adhered to in a long line of authorities. *Truman v. Truman,* 79 Iowa 506; *Bevington v. Bevington,* 133 Iowa 351; *Holmes v. Connable,* 111 Iowa 298; *Ross v. Ross,* 148 Iowa 729, 730; *Minion v. Adams,* 181 Iowa 267.

The important question presented in this case is whether the evidence presented is, on the whole, of the character required.

III.	The evidence offered by appellee is, in substance:

A. L. Groh, husband of appellee, testified that, after the death of Mrs. Boss, he overheard a conversation between his wife and Mr. Boss relative to a contract, in which conversation he

took no part whatsoever; that he heard Boss make the statement to his wife "that, if we would move over there in that place with him, he would give us that property, to take care of him as long as he lived;" that Boss came over to their house for dinner; that he (Groh) was in the room where his wife and Boss were; that, about the first thing Boss said was that he would like to have them move over to his house, and that he said, "if we would move with him and stay with him as long as he lived, that the property would be my wife's. My wife said, 'We will think about it.'" He further testified that afterwards, on the day they moved into the Boss house, he overheard another statement made by Boss to his wife, in which he took no part; that "he told my wife that the property was hers, and he hoped she would never have to move again;" that Boss told his wife that whatever goods she wanted to keep, the others he would either give away or put in the barn; that he and his wife put their furniture in the house, and took out Boss's furniture that he did not need; that, about nine months prior, he had heard a conversation between his wife and Boss, in which he took no part, in which he heard Boss tell Mrs. Groh to take care of Mrs. Boss and to do the cooking and putting up fruit and the like, and that she would be well paid for it; that he heard Boss say to his wife, when she was putting up fruit at the Boss home, that "she would be well paid for the work that she had done."

Counsel for appellants made objections to the witness and to his testimony, as incompetent under Code Section 4604. Groh testified in each instance that he took no part whatever in the conversations between his wife and Boss; that he said nothing; that he had no talk with Boss whatever, except about the nice weather. On cross-examination, Groh testified that, in the conversation which he overheard between his wife and Boss on the day they moved into the Boss house, "there was nothing said about me coming there. I did not speak up and ask him what he was going to do with me. Nothing was said about who was to keep the house, nor the board, nor who was to board him; but he said to take what furniture we wanted. I never talked to Boss anything further about it. I was not satisfied with the arrangements. I talked about renting another house. I tried twice, after we moved into his house. I went to look at the Wilkins

house and another house, but I never rented. About a week before Mr. Boss died, I talked with Mr. Wilkins. I told Wilkins I would have to move. I told Mr. Wilkins I wanted to move away from that place, and wanted to rent his place. Mr. Boss paid the taxes on his house. Mr. Boss furnished the coal.''

Mary Groh, mother of the husband of appellee, testified that she was at her son's home when her son and his wife moved into the Boss home; that, before they moved, she had a talk with Mr. Boss, and asked him what rent they were going to pay, and Mr. Boss said he wanted them to take care of him, and that he could not get along without them, and that Mrs. Groh had done things other people would not have done; that she never heard Boss say anything about paying appellee for what she had done, or anything of that kind; that Boss said he would give appellee the property, if she would come there and live with him; that Boss did not say anything about making a deed; that he did not say anything about how he would give the property to them, or when; that nothing was said about who was to furnish the fuel or pay the taxes.

Laura Barton testified that she is a practical nurse, and the niece of Mrs. Boss; that she was with Mrs. Boss when the latter was sick; that she was there off and on, two weeks at a time; that she was there from in January until in July; that she was there from two or three months after Mrs. Boss was injured until she died; that she stayed with Mrs. Boss off and on from the beginning of her sickness to the end; that she saw appellee there a good many times; that appellee assisted her a good many times in giving Mrs. Boss a bath; that, toward the last, after Mrs. Boss was crippled, she insisted upon appellee's helping to put her to bed and in bathing and washing her quite a few times; that Mr. Boss generally helped with anything that needed to be done; that she had a conversation with Mr. Boss, after the death of Mrs. Boss, about what he was going to do and where he was going to live; that Mr. Boss wanted to know if she would come and live with him, and she told him she could not; that he said he did not know what he would do; that she stayed one day after Mrs. Boss died, and Mr. Boss asked her what she thought about having Mrs. Groh move in and stay with him, and he said: ''If I

do, and she does, what do you think about my deeding her this property?''

''He said he would see about it, and would let me know later on. He wrote me a letter, and told me they had moved in. That is all he did say. Mr. Boss said a good many times that he did not know how he would get along, from the time I was there until I got back, if it were not for Mrs. Groh. Lots of other neighbors assisted, but he depended on Mrs. Groh.''

Tim Cox, brother of Mrs. Boss, testified that he was at the Boss home several times during the illness of Mrs. Boss, and attended the funeral of Mrs. Boss. He testified that:

''The next day after the funeral, I asked Mr. Boss what he thought he would do, and Mr. Boss said: 'I am going to have Mrs. Groh move over here and stay right here. She has done so much for my wife, and I want her to take care of me.' He said he was going to let them have the place when he was done.''

On cross-examination, Cox testified that Boss said:

''If they would stay there and take care of him and they could get along, he would let them have the place when he was through with it. Mr. Boss said: 'I am going to stay right here. and have these people move in and take care of me.' ''

Dr. John Stanton, the Boss family physician, testified that Boss came into his office in the latter part of the year 1920, and told him that he finally got Mr. and Mrs. Groh to move over to his place; that Mrs. Groh was worrying about some rental on property they had rented; and that he told her not to worry about that, and told her that, if she would come over there, and they could get along all right, the probability was that she would never need another one (meaning home).

Margaret Miller, neighbor, testified to a conversation she had with Mr. Boss after Mrs. Boss's death, in which she remarked to Mr. Boss that he was lucky to have someone to have a home with, and he replied: ''Yes; I am going to fix it so that Mrs. Groh can have the property. My wife always wanted her to have it.''

Witnesses called by appellants testified, in substance, as follows:

Frank Wilkins, engaged in selling automobiles, testified that he had a conversation with A. L. Groh, husband of appellee, in

August, 1921, about two weeks before the death of Laurel Boss, in regard to renting a dwelling house owned by his (Wilkins') wife; that the price was agreed upon; that Groh. did not say that he would take the property for certain; that the understanding was that, as soon as the tenant who was in the property moved out, Groh would take it, if he took it at all; that Groh said he did not want to lose the garden he had raised on the Boss property.

Mrs. Stella Whitman, one of the neighbors of the Boss family, testified that she had a talk with Mr. Boss, the Sunday before the Grohs moved into the Boss home; that Mr. Boss came to their house on that Sunday evening; that her husband, Brice Whitman, and his father and mother were present; that Mr. Boss said, ''Mr. and Mrs. Groh are going to move in with me this week,'' and she said, ''well, that will be nice, if you get along,'' and he said, ''I don't know why we couldn't; I will furnish the house, the fuel, and the meat, and they will live with me.''

Brice Whitman, employee of the Burlington railroad, testified that he had known Laurel Boss for thirty years; that Boss visited at their house the Sunday before Mr. and Mrs. Groh moved into his house, and he had a conversation with them in the presence of his wife, in which his wife, Stella Whitman, was present, and engaged in the conversation; that Mr. Boss said that Mrs. Groh was going to move in with them that week; that his wife remarked, ''That would be very nice, if you can get along all right.'' He said, ''Yes, I think we can.'' He said: ''I am going to furnish the house and furniture and meat and wood, or fuel.''

Floyd Burlen, tenant on the Boss farm, testified that, after the Grohs moved into the Boss home, at the request of Mr. Boss he delivered to the Boss home a 225-pound hog and about 200 pounds of beef which were butchered on the farm.

Mrs. Alice Noble, an acquaintance of Laurel Boss and his wife's for many years, testified that she had a conversation with Mr. Boss about the arrangement by which the Grohs moved into his house; that Mr. Boss said ''he decided to let Mrs. Groh move in there; that he would furnish the fuel and meat, and would pay them well, and he could live with them.''

James Robbins testified to conversations with Mr. Groh and

Mr. Boss, relative to the occupancy of the Boss homestead. He said that Mr. Groh told him that they were going to move into the Boss dwelling; that Boss was to furnish them a house and the fuel and part of the meat; that Mr. Boss would get the meat from the farm, and that they were going to take care of him, and he was to board with them; that, in August, 1921, Mr. Groh told him that Boss was hard to get along with, and they were going to move out as soon as they could get a place to live; that Mr. Boss had reserved one of the front rooms of the house, and was cranky about their using it, and that his mother expected to stay with them part of the time, and they did not have room enough, and he was going to move out. Robbins also testified that, in a conversation with Mr. Boss in August, 1921, at the Boss farm, Boss told him that the Grohs were moving, and that he wanted to remain at the farm until they were gone.

Mrs. I. N. Downard, who had known Mr. Boss for 38 years, testified that Boss was at their home in April, 1921, and said that, when the Grohs moved out of his house, he would like to have her and her husband move in and keep house for him; that she had another conversation with Boss, just before he went to Des Moines for treatment, in August, 1921, a short time before his death, in which he said that he would be gone a few days, and that, when he came back, he would see them and talk about their moving into his house; that he said he was boarding with the Grohs, that they did not pay any rent, and that he was just staying with them; that he did not say on what terms; that he said he furnished the meat, half a hog and a quarter of beef, and bought lots of stuff at the stores.

Bert Yeagle, a business man of Chariton, testified that he had a conversation with Mr. Groh in Groh's barber shop, the latter part of August or the 1st of September, 1921; that they were talking about Mr. Boss's illness; that Groh said he had a place rented, and was going to move, but would not leave Boss when he was sick; that he was willing to stay, if Wright would pay the rent on the house which he had rented and expected to move into when he moved out of the Boss house.

Mrs. Kate Wright testified that she called at the Laurel Boss home after the death of Mrs. Boss, and while Mr. and Mrs. Groh were living there; that she had a conversation with Mrs.

Groh as to how she was living in the Laurel Boss property; that Mrs. Groh said that he (Boss) was to furnish the house and the fuel in consideration for his board, and he was to reserve the front bedroom.

F. G. Carson, engaged in the real estate business, testified that, some time in August, 1921, Mr. Groh asked him if he had any properties to rent; that he asked Groh if he was figuring on moving, and Groh said, "Yes;" that he said to Groh, "Aren't you going to stay there any longer?" and Groh said, "No, I should say not."

D. A. Enslow, engaged in business as a contractor and builder in Chariton, an acquaintance of Groh's and acquainted for forty years with Boss, testified that he had a conversation with Groh, at the time Mr. Boss was in Des Moines for treatment, in August, 1921; that the conversation was in the barber shop of Mr. Groh; that Groh said that Boss was "a stingy old hog; that he wouldn't give them a cent while they were there, except the rent of the house, to keep them, and that he [Groh] was running behind in expenses all the time." He said, "I have rented a house now to move into;" and he said that, if they would pay the rent of his house, and pay him for taking care of Boss, he would take care of Boss, if they brought him back.

Robert McCoy testified that he had a conversation with Mr. Groh in the fall of 1920, in which Groh asked him if he had a house to rent; that he told Groh that the house he lived in would be for rent when he vacated it, in March, 1921; and that Groh said that, if he did not have a house by that time, he would try to rent it.

T. H. Maxwell testified that Mr. Boss bought the coal for the house during the year 1921.

A. L. Groh, called as a witness for plaintiff in rebuttal, testified that he talked with Frank Wilkins, who testified for defendants, about renting a house; that he told Wilkins that he would like to rent a place, on account of the conditions at home, the filthy habits of Mr. Boss; that he went and looked at the Wilkins house; that Mr. Boss furnished some meat; that he (Groh) furnished the meat for the table, except what Mr. Boss brought from the farm.

Leota Groh, appellee, called in rebuttal, denied having any

conversation with Mrs. Kate Wright, a witness for defendant, about renting the property from Mr. Boss. She testified that she did not say to Mrs. Wright that Boss was to furnish the house and fuel, for board and room. Appellee also testified that, many times in the summer and fall of 1921, her husband wanted to move, and asked her about renting a house to move into; and that she did not consent to move.

IV. The question presented is whether the evidence as a whole is sufficient, and of that clear, convincing, satisfactory, and conclusive character required to establish the parol contract claimed by appellee. Our court and the courts of other jurisdictions have repeatedly held that a parol contract to convey real estate made by a party in his lifetime may be enforced after his death against his estate. But all courts have said that the proof offered to establish such contract must be carefully scrutinized, to see that it meets the test of being definite, positive, conclusive, and satisfactory. This must necessarily be the rule, because the lips of the only person who could deny making such a contract are closed in death. In the case before us, the only person who could directly controvert the statements alleged to have been made by him is the dead man, against whose estate this claim is made. The strongest testimony produced by appellee in support of her claimed agreement with Boss to convey the property in controversy to her was that of her husband, A. L. Groh. The husband testified to what he claims was said in several conversations between his wife and Boss, in which, he says, he remained absolutely silent, except to mention the nice weather. If he took no part in said conversations, his testimony is competent. It is hard to believe that this loquacious man, who talked freely to men who came into his barber shop about the arrangement under which they were living in the Boss home, and about renting other property to move into, would remain absolutely silent upon all occasions when his wife and Boss were discussing their moving into the Boss home. But, holding that the testimony given by Groh is competent, we must consider it together with the testimony of other witnesses, especially that of the persons with whom he talked about renting dwellings and moving out of the Boss home, and about the arrangement under which they were to occupy the Boss home. Groh admitted that

he had negotiated, while he was living in the Boss home, for the rental of some two or three dwelling houses, to move into. Witness James Robbins testified that Groh told him that he and his wife were going to move into the Boss home, and Boss was to furnish them the house and the fuel and part of the meat; and that, in August, 1921, Groh told him that he was going to move out. Witness Bert Yeagle testified that Groh told him that he was going to rent a place and move out of the Boss property; and D. N. Enslow testified that Groh said to him that "Boss was a stingy old hog,—that he wouldn't give them a cent while they were there, except the rental of the house;" and that he had rented a house to move into.

The testimony of other witnesses bearing on the claimed contract is substantially to the effect that Mr. Boss told them that appellee had been very kind and helpful in taking care of his wife, and that he wanted her to move into his home and take care of him, and that she would be well paid, and that he was going to let the Grohs have the property, when he was done with it. He told Margaret Miller: "I am going to fix it so Mrs. Groh can have the property."

Taking the evidence produced by appellee, standing alone, without considering the evidence of appellants, we think that it does not meet the requirement to establish a parol agreement for the conveyance of the property in controversy. Taking this evidence as true, we doubt its sufficiency to establish an agreement to convey real estate. At most, it tends to prove only an intention or executory purpose to convey in some manner, and not an executed contract to convey the property.

Witness for appellants, Mrs. Kate Wright, who is not related to either party, and who has no interest in the result of the case, testified:

"I had a conversation with Mrs. Leota Groh as to how she was living in the Laurel Boss property. She said he was to furnish the house and the fuel for his board, and he was to reserve the front bedroom. Mrs. Groh told me that. It was just a few days after they moved into the house."

Taking the testimony as a whole, we think it tends more to show a rental agreement than one to convey.

We reach the conclusion that the decree of the lower court

does not have sufficient support in the evidence, and it must be and is reversed. The case is remanded for dismissal of appellee's cause of action, and for an order, if required, giving appellants possession of the property in controversy.—*Reversed and remanded.*

PRESTON, C. J., EVANS and FAVILLE, JJ., concur.