MARGARET FRANCIS, Appellee, v. HENRY A. FRANCIS et al., Appellants; MELVIN FRANCIS et al., Appellees.

**WILLS:** Contract to Devise—Contract for Property at Death—Evidence. Evidence reviewed, and held sufficient to establish the making of a contract between a brother and sister by which all property accumulated by the brother should belong to the sister on the death of the brother.

**EVIDENCE:** Weight and Sufficiency—Testimony Impossible of Contradiction. Reasonable testimony from a credible witness may not be disbelieved simply because it is not and cannot be contradicted.

**CONTRACTS:** Parties, Proposals and Acceptances—Proposal with Implied Acceptance. A contract between a brother and sister may be sufficiently shown by evidence that the brother stated the terms of the proposed contract to his mother, in a conversation in which the sister took no part, and that the sister thereafter acted on such stated terms, especially where the fact that such contract was made is supported by disinterested corroborating testimony.

**WITNESSES:** Competency—Transactions With Deceased—Burden of Proof. The court will not *presume* that certain testimony constitutes or is a part of a personal transaction with a deceased person, within Section 4604, Code, 1897. Such fact must appear from the circumstances, or the objecting party must show it.

**PARTNERSHIP:** Creation and Requisites—Profits and Losses. A sharing of profits and losses is necessary to the creation of a partnership.

*Appeal from Calhoun District Court.*—E. G. ALBERT, Judge.

TUESDAY, MAY 22, 1917.

REHEARING DENIED MONDAY, SEPTEMBER 24, 1917.

THIS is an action in equity to have all the property

that Smiley Francis, deceased, had at the time of his death, declared to be the property of plaintiff, under an oral contract which plaintiff claimed to have had with the deceased, and, failing in that contention, to have the court award her such an amount from the estate of deceased as would compensate her for services performed by her for deceased during his lifetime, and to have certain property declared hers that was taken possession of by the administrator, and which she claims was owned by her as her separate property. There was a trial on the merits, and a decree for plaintiff awarding her all the property, subject to the payment of debts against the estate and encumbrances on the land. A part of the defendants appeal.—*Affirmed.*

*M. W. Frick,* and *Brammer, Lehmann & Seevers,* for appellants.

*Gray & Gray,* for appellee.

1. WILLS: contract to devise: contract for property at death: evidence.

PRESTON, J.—Plaintiff's claim is substantially this: That, about 19 years prior to the death of her brother, Smiley Francis, deceased, she had an oral contract with him to the effect that, if she would go with him on a farm and assist him in his farming operations, her brother was to support her, and at his death, all his property of which he died seized should belong to her; that her brother died intestate on November 20, 1914; that deceased never married, left no widow, child or children or father or mother surviving him, but left brothers and sisters and nephews and nieces, who are defendants in the petition; that said contract was reiterated and told by deceased to divers persons and at frequent times in the presence and hearing of plaintiff up to the time of his death; that plaintiff relied thereon, and went on the farm with him, worked, labored, kept books, kept house, hired and discharged hands, settled

accounts, paid the men, and had the general supervision of the farm, and that she continued and performed her part of the agreement up to the time of her brother's death; that certain personal property which belonged to plaintiff individually was taken possession of by the administrator and sold and reported as part of the assets of the estate. She also alleged that, in addition to the property plaintiff owned separately, she and deceased were in partnership, and that she owned an undivided half of the property. She asked that a decree be entered declaring her to be the owner of the property, whether real, personal or mixed, of which her brother died seized; that, if she fails in her proof that she is the owner under the contract, then she be awarded a reasonable compensation for her services to the deceased; that it be declared, if she fails in her proof of her ownership, that she was the owner of an undivided one half of the property of which deceased died seized; and that she have an award declaring that her individual property was hers, and an order on the administrator to turn the proceeds of the same over to her, and for general equitable relief.

Defendant admitted the relationship of the parties, and that deceased died seized of the real estate and personal property described in the petition, and denied all other material allegations.

The trial court, in a written opinion filed, found as follows:

"The following facts are either admitted or fairly satisfactorily proven by a preponderance of the evidence:

"That Smiley Francis, who for many years was a resident of Calhoun County, Iowa, was killed in an automobile accident on or about the 20th of November, 1914; that he was never married; that he left no children surviving him; that he left no father or mother surviving him; and that he left no will. The plaintiff was a sister of said Smi-

ley Francis, and she, together with her brothers and sisters and the descendants of a deceased sister, all of whom are made defendants, constitute all the legal heirs of the said Smiley Francis. That the said Smiley Francis died seized of certain real estate and certain personal property described in plaintiff's petition. That, subsequent to the death of Smiley Francis, one F. P. Huff was duly appointed administrator of the estate of said Smiley Francis in Calhoun County, Iowa, and that he duly qualified and is now acting as such administrator. That about March 1, 1896, the said Smiley Francis, having previously bought an eighty-acre tract of land, became financially embarrassed, and felt that he was unable to successfully meet the financial distress without help; that about the 1st of March, 1896, plaintiff went to the home of the said Smiley Francis, and from that time until the time of his death, she did the housework, worked on the farm, did chores, employed and discharged farm hands, and generally aided and assisted in the management of his farm and business. The court further finds that, at about the time the plantiff went to live with the said Smiley Francis, that a contract was made, by the terms of which, in consideration of the services to be performed by the said plaintiff, the said Smiley Francis agreed that, at the time of his death, the plaintiff was to have all of his property of which he died seized and possessed; that the plaintiff acted and relied upon said contract; and that she carried out her part of the same in all its terms. This matter thus resolves itself, therefore, into the simple question of the specific performance of the contract. The court having found that the contract was made, and that the plaintiff has performed her part of the contract, it is therefore ordered that the same should be specifically enforced, and it is further ordered that the said Huff, as administrator of the estate of Smiley Francis, shall complete said administration, paying all debts, costs of administration,

etc., and, upon the completion of his duties as adminis-
trator, shall turn over to the plaintiff any and all prop-
erty of whatsoever kind and nature left in his hands as
such administrator, and. take her receipt therefor. The
court further finds that, subject to the necessity of any
part of said land being required for the payment of debts,
that the plaintiff should be and is decreed to be the owner,
in fee simple, of the land described in plaintiff's petition.
Plaintiff to draw decree in accordance herewith and sub-
mit same for signature."

A decree was entered in accordance with the opinion
and findings of the court.

The question presented is largely one of fact as to
whether the findings and decree of the district court are
sustained by the evidence. It is not our custom to attempt
to set out the evidence in detail in such a case, where there
is a long record. It would be impracticable to do so within
the proper limits of an opinion. It appears that, at the
time of the making of the alleged contract, plaintiff was
about 21 or 22 years of age, unmarried, and that she has
never married; that, at that time, her brother, the deceased,
owned 80 acres of land, which at that time was doubtless
not as valuable as now. That, at the time of the death
of Smiley Francis, he left 320 acres of land in Calhoun
County, subject to mortgages aggregating $7,800; also, a
212-acre farm in Minnesota, subject to an encumbrance of
$17,200; also, real estate in Rockwell City and Jolley; and
personal property which the administrator sold for $13,-
536.13. In addition to the encumbrances against the farms,
claims amounting to $18,721 have been filed against his
estate.

Perhaps it will be as good a way as any for us to state
the claims of each party for the testimony introduced, and
then give our conclusions, without attempting to set out
in detail the testimony. It is claimed for appellee:

"That Smiley Francis, who for many years was a resident of Calhoun County, Iowa, was killed in an automobile accident on or about the 20th day of November, 1914; that he was never married; that he left no children surviving him; that he left no father or mother surviving him; that he left no will. The plaintiff was a sister of said Smiley Francis; that she, together with her brothers and sisters and the descendants of a deceased sister, all of whom are defendants, constitute all the legal heirs of said Smiley Francis, deceased; that the said Smiley Francis died seized and possessed of the property mentioned. That, about March 1, 1896, the said Smiley Francis, having previously bought an eighty-acre tract of land, became financially embarrassed, and felt that he was unable to successfully meet the financial distress without help; that, about the 1st of March, 1896, the plaintiff went to the home of the said Smiley Francis, and from that time until the time of his death, she did the housework, worked on the farm, employed and discharged farm hands, and generally aided and assisted in the management of the farm and business, and they rented land and farmed about four hundred acres, a part of which was rented by them. That, previous to the plaintiff going to live with the said Smiley Francis, the plaintiff testifies, the said Francis agreed with the mother of the plaintiff that, if the plaintiff would go and live with him, that he would see that she had a good living, and that when he was gone, that plaintiff should have everything."

In response to a question which asked plaintiff to state how it happened that she went onto the place where she now is, over objection by appellants that the testimony and the witness were incompetent under Section 4604 of the Code, she testifies:

"A.   I was living out here with my father and mother, and Smiley came down one evening, and he was talking to my mother and told her that, if he did not have someone

to help him, that he would lose what he had put into the place, and wanted to know whether I could go with him. And she told him that I could if I wanted to, and she asked him why he didn't keep Charles and his wife there with him. He said he couldn't get along with them, and he told her if I would come and go with him, that he would see that I had a good living, and that, when he was gone, that I should have everything; and I went with him."

She further testified that this conversation between her brother and her mother occurred one evening, and that she took no part in it; that her brother stayed at the mother's house that night, and she went with him to his own farm the next day, and stayed there until his death.

Appellants concede that this testimony is not denied and cannot be denied, because her brother and mother are dead; but they contend that it may yet be tested by its own inherent improbabilities. They also contend that this does not constitute a contract between plaintiff and defendant. This matter will be referred to later.

Continuing appellee's claim for the testimony, they say further:

"That, had she not heard this conversation between Smiley Francis and her mother, that she would have gone to Illinois. That she had previously intended going to Illinois. That there were acquaintances in Illinois that desired her to live with them and care for them during their life; that she knew of their financial condition; that these old people owned land and were well to do. Plaintiff did the house work in general, milking, cooking, looking after hogs, worked in the field husking corn and such as that; looked after cattle and horses and worked in the fields late at night, churned butter, did the shopping, made garden, kept books of accounts and hired hands. She showed a disposition to take charge of things and do as much as possible herself; she was manager and bookkeeper on the farm;

settled store accounts, hired and discharged men, and doctored sick horses; and defendant Willie Lamb said Smiley left everything there for her to look after, and she always attended to all the stuff and had the general management of the farm."

Frank Reed, who worked for Smiley Francis from 1905 to 1910, testified that he never heard Smiley say anything about the way Margaret was working there, but at several times, he said that, "when he died, Maggie should have everything he had. I remember, when Maggie threatened to quit working so hard and go home, Smiley said when he was gone, she should have the rest of it, what was left. Maggie threatened to leave several times, and I know he always said that if she stayed there, that when he died, everything was hers."

On cross-examination, he said that, when Maggie threatened to leave, "Smiley did not tell her that if she did stay he would make a will, but he said that, when he died, everything would belong to her." Again, "Smiley said the property was owned by 'me and Maggie,' quite a number of times. Maggie said she had a notion to quit. Smiley said if she would stay with him, when he died everything was hers. He said when he died everything would be hers;" and he said the property was just as much Maggie's as it was his. On re-cross examination, he testified that Smiley had promised Maggie that, when he died, everything would be hers.

John Hensley testified that Smiley said, in speaking of Maggie, "She has stayed with me during all these years, and she is a partner of mine, the only partner I have."

"We talked several times about his affairs; he stated that, 'if anything should happen to me, I expect Maggie to have everything we have there.'"

On cross-examination, he said that Smiley did not say

there was a will or a contract for a will, but he said he had made a contract.

Fred Gillman, who worked on the farm in 1911, 1912, 1913, testified that Smiley told him twice that Maggie was to have his property when he died.

James Brown testified that Smiley told him more than once that, when he was through with his property, he intended Maggie to have it, for she was the one who helped to make it, and stayed with him. She stayed there 18 or 19 years. The last time he talked with Smiley was about a month before he died.

The witness Roy Laird testified that Smiley said that "Maggie and him had an understanding of 50 to 50; that they were in half and half. He said that there was an understanding between them that the one that was living should have all the property." On cross-examination, he said: "No, sir, he didn't say they had ever made a contract, just a mutual understanding."

Joe Dinkin testified that Smiley said to Maggie, after they returned from Melvin Francis' house on a Sunday when they were discussing their treatment, "I want you to have everything that I have got when I am gone."

Mrs. Willie Lamb, a defendant who took no part in that conversation, testified that Smiley said to Maggie that he had everything fixed so she could have the property, and their money would not go that way any more, and he said that, when he died, she should have the property. Plaintiff complained to deceased that some of the persons deceased was helping financially were spending money for beer.

Willie Lamb, another defendant, said, in reference to this same conversation, that Smiley said to Maggie, "I have it all fixed so will get it all," and Smiley always said he had it fixed so she would get it all.

D. E. Laird, who had known Smiley Francis since 1894,

testified that Smiley told him time and again what he ex-
pected to do with his property, and—

"He said that he and Maggie were working together,
and that they made it up between themselves that, when
they were done with it, they were to will it to one another.
He said he would fix it so none of them would have a dollar,
except Maggie; and he said that the agreement was between
Smiley and Maggie that, if one should die, the other should
have the property."

The plaintiff testified that she heard a conversation be-
tween Dr. Noland and Smiley, within a short time after
she went on the farm, with reference to his property at the
time he was sick, in which she took no part, wherein Smiley
informed the doctor that everything was to be hers except
his watch, which he wanted Melvin to have. The plaintiff
heard a conversation in reference to property between
Frank Reed and Smiley, in which she took no part, in
which Smiley stated that, when he was gone, every bit would
be hers. The plaintiff heard a conversation in reference to
property between Fred Gillman and Smiley, in which she
took no part, in which Smiley stated that Maggie was to
have everything when he was gone. She heard a conver-
sation in reference to property between Joe Dinkin and
Smiley in 1914, in which she took no part, in which Smiley
said, "Every dollar that has been made on this farm is
Mag's when I am gone." The plaintiff believed these state-
ments and relied thereon, and never married because of
the statements.

"He told so many different ones that everything would
be mine when he was gone, and I thought if I stayed there,
it would be as good a thing as I could have, and said
work was performed under these promises."

O. E. Crabtree, a witness for the defendants, testified
on direct examination that there was an agreement between
Smiley and Maggie in regard to the property. The agree-

ment was what they talked about, "that the rest of them would not get any, but that he was willing for Melvin to have his share, and I understood him to mean that Melvin should have one-seventh, and that Maggie should have the rest."

As corroborating the fact that there was a contract between the plaintiff, Margaret Francis, and the deceased, Smiley Francis, and that she is entitled to the things asked for in her petition, we show the following facts:

Smiley Francis stated to J. P. Moore, "What we have got, Maggie and me made it." When speaking of his property, he said "ours" lots of times. When he talked of doing things, he would say "we." Smiley said the property was owned by "me and Maggie" quite a number of times, in speaking to Frank Reed. To John Hensley, Smiley said Maggie was a partner of his. Joe Duncan testified that he heard Smiley say, in the presence of Maggie, in speaking of his relatives, "They won't get a cent of our money, we have worked for. We have worked hard for this money, and I am not going to give them a cent. We have worked hard all our lives, and the rest of them will not get to spend our money;" and, referring to the property, he said he was going to give it to Maggie. On cross examination, he says: "They should not get a damned cent he had," and he intended Maggie should have it all. Smiley, in speaking to Clyde Gustlin about his and Mag's property, said, "What he had was hers, and what she had was his." Ed. Hurdel said he wanted to buy some land from Smiley, and he would not sell until he had consulted Maggie, and he did not buy because they had concluded not to sell. He talked about his property to him, and said he was going to will it to Maggie. Harry Snyder testified that Smiley stated to him and Mrs. Wallace, in the presence of Maggie, that he intended to will all his property to Maggie, because she helped to make it. Mrs. Wallace testified that Smiley said

to her, in presence of Snyder and Maggie, concerning making a will and his property, that what he had was Mag's.

O. C. Walters testified that he talked with Smiley about his property and why he was accumulating more, and he stated that Maggie could use it when he was through with it, and at another time, when being joshed about building an orphan asylum, he stated "that Maggie could build what she wanted to with it." Thomas D. Conroy testified that Smiley told him none of the family would get any of his property, with the exception of his sister Maggie and Melvin.

Bert Reynolds testified that Smiley told him, when talking about his property and a will, that he had enough to keep him, and he expected Maggie to have enough to keep her, and he believed he ought to look after it right away; that "Mag and him had earned the property."

The plaintiff relied upon her contract, as is shown by the testimony of Wellington Francis, a defendant, who testified that, before the petition of administration was signed, and while they were all gathered at the home of B. F. Owens, another defendant and he offered to give the plaintiff the home place. "She said we were gathered there to beat her, and she was going to have it all or she would not have anything." Charles Francis, another defendant, testified that plaintiff said at the bank, the day the petition for administration was signed, she wanted it all or none. Also at Frank Owens' house, and before she commenced suit, Charles and Wellington told her they had nothing to give her.

The undisputed evidence shows that plaintiff worked on the farm between 18 or 19 years, and, according to Thomas D. Conroy, her services were worth $100 per month, and according to W. R. Owens, $75.00 per month, the only evidence that was given in the trial as to value of services.

Such, in a general way, is the claim of appellee for the testimony on the trial.

Appellants' statement of the facts, as they claim them to be from the evidence, is substantially this: That, prior to 1896, Smiley Francis was a young, unmarried man, living upon and working his own farm; that, about March 1, 1896, Margaret moved to his place and began keeping house for him; that the brother and sister continued to live together and to work the farm until his death. They concede that she did work substantially as claimed by appellee, evidence as to which we shall not now repeat; that she also kept the farm and household accounts, and signed her brother's name to checks in payment of bills incurred; that, in short, she did the work which a woman living upon a farm ordinarily does; and that the brother did such work as a man living upon a farm ordinarily does; and that they lived and worked much as other people on Iowa farms live and work. They refer to the fact that plaintiff had two or three spells of sickness during the 19 years, and that her brother paid the expenses for doctors, hospital and medicine; but the record shows that she spent about $350 for one operation, and the record also shows that the deceased was sick a part of the time. Appellants say that, in return for the services which plaintiff rendered, deceased furnished her board, lodging, clothing and other necessities, hired her whatever girls or other assistants she desired, and gave her driving horses and buggy, an automobile, an insurance policy, and whatever spending money she needed; that the brother and sister lived pleasantly together; that the farm was large, and undoubtedly the work was hard, but that, on the other hand, the farm was prosperous, and plaintiff could and did obtain whatever she required or desired; that, in 1910, the First National Bank obtained a small judgment against plaintiff, and, as it was not paid, called her upon the stand and examined her under pro-

ceedings supplementary to execution, and that she there testified that she had no contract or arrangement with her brother for pay for the work she did; that she further testified that, at that time, she owned no live stock or other personal property. They say, also, that, on November 23, 1914, plaintiff joined her brothers and sisters in petitioning for an administrator, and that thereafter, she helped the administrator prepare an inventory of the real and personal property; that this inventory did not include driving horses and certain other property which plaintiff claimed as her own; that she then claimed as her own the driving horses and some household furniture, and that this was given to her; and that she also claimed about 40 sheep. They say, also, that, during the time plaintiff was preparing this inventory, she was negotiating with her brothers and sisters, and claiming that, as she had helped Smiley manage the property, she should have more than her share, and that this claim was recognized by her brothers and sisters, as various concessions were offered her; that, no agreement on this subject being reached, she brought this suit.

There is no dispute between counsel as to the quality and quantity of proof required in such a case. After examining the record, we are satisfied that the decree is sustained by the evidence, giving, as we do, some weight to the finding of the trial court, because of his superior situation to weigh the testimony of the different witnesses. In doing this, we take into consideration all the facts and circumstances in the case, not only the testimony of plaintiff herself, but the testimony of all other witnesses, wherein deceased stated, with some variation, but substantially, that there was a contract or agreement substantially as claimed by plaintiff, and that plaintiff fully and faithfully performed her part of the contract.

As before stated, it is conceded by appellants that much of the testimony is not and cannot be, from the very nature of the case, contradicted, and they contend and cite authorities that, in such cases as this, the courts are not compelled to believe the testimony of witnesses simply because the witnesses so testify; that the evidence should be closely scrutinized and weighed in accordance with its reasonableness and inherent probability. The rule is wholesome, and is adhered to; but it does not follow that, if the witnesses are credible, and the stories they tell are reasonable, the courts are required to disbelieve, simply because it is not contradicted.

*2. EVIDENCE: weight and sufficiency: testimony impossible of contradiction.*

We shall refer to some of the circumstances relied upon by appellants which they claim tend to weaken some of the testimony, particularly that of the plaintiff herself. They refer to her testimony given on her examination in proceedings supplementary to execution. She did testify there that there was no arrangement with her brother for her salary or pay for the work that she was doing; that she never received any pay from him; that, if she asked for money, she always got it, but that she never had wages or anything like that; that, at that time, 1910, she did not own any stock on the farm nor a horse and buggy; that she had never taken anything from her brother for any work or labor she performed for him, and that there had never been anything said about pay; that she never had any cattle or hogs. It is thought and argued by appellants that this squarely contradicts the story she now tells, and it may be true that there was some equivocation on her part at the time of such examination. But she did not at any time deny that she had such a contract or arrangement as she now claims to have had with her brother. We must keep in mind the purpose of that examination. It was for the purpose of discovering whether plaintiff then had any

property that could be reached on execution, to satisfy the judgment of the bank which had instigated the proceedings. The questions were so framed, and the answers were such as to show that she was not receiving pay or wages for the work she was doing. This, it seems to us, is not inconsistent with the claim that she now makes that there was a contract by which, at her brother's death, she was to have the property. It is doubtless true, as contended by appellants, that, had she told what the real contract or arrangement was, it would develop nothing which could be reached on execution. She was not asked that question, but was asked what the arrangement was as to pay or wages. Plaintiff was not represented by counsel at that hearing, and the entire situation was not developed: As stated, counsel for the bank were seeking to find out whether she then had any property which could be reached on execution, and the questions were framed with that in view. It does appear that, at her brother's death, she claimed some of the personal property, but the record does not clearly show just when she acquired such property, whether before or after the examination in 1910. Appellants state in argument that it was then five years prior to the death of Smiley. Conceding that, and, if the case depended entirely upon the testimony of plaintiff, her evidence given on the examination in 1910 would weaken her testimony, still we must keep in mind that there were a large number of other witnesses who were disinterested, whose testimony, taken altogether, shows that there was such a contract as plaintiff claims.

3. CONTRACTS: parties, proposals and acceptances: proposal with implied acceptance.

It is next contended by appellants that, if plaintiff's testimony as to what the contract was is believed, it is insufficient to constitute a contract, because the conversation with the mother was not a contract with the daughter; and that, if the daughter took no part in the

transaction, she was neither bound nor benefited by it; that it does not show a contract with plaintiff, and no contract for plaintiff's benefit. They say that the conversation between deceased and his mother, who was also plaintiff's mother, is the nearest approach to any direct evidence of plaintiff's alleged contract with deceased. They contend, on the other hand, that, if the conversation constitutes any contract at all, it was a contract between deceased and plaintiff, and therefore a personal transaction. Their conclusion from this is that plaintiff either participated in the entire conversation at the time, or that no such conversation took place. But they concede that the purpose of deceased was to get Margaret to keep house for him; that the mother, plaintiff and deceased were alone together, and deceased broached the purpose of his visit to the mother; that the mother took no dominant part, but, on the contrary, that she definitely left the decision to plaintiff, by saying, as Margaret puts it, "She said I could go if I wanted to;" and they say further that deceased, having learned that plaintiff could go if she wanted to, was satisfied. Plaintiff did, however, accept the offer, and went to defendant's home and stayed there for 19 years, and performed the services before referred to. Such contracts between relatives are often made, without being reduced to writing and without being made as specific as to details as strangers would make them. It would be better many times if they were more particular about it. But the testimony of plaintiff which we have before set out was in response to the question as to how she happened to go to her brother's, and she gave the conversation as stated. Plaintiff at that time was living with her mother, and we think it is not unnatural that the son should talk with his mother before asking the daughter to leave her. Strictly speaking, perhaps, the conversation between deceased and the mother would not constitute a contract between plaintiff and the

deceased, and yet, as conceded by appellants, the purpose of deceased was to have plaintiff go with him and keep house for him, and if she acted upon that, as her testimony shows, and that of other witnesses, relying on such statements, we think this, in connection with the other evidence of other witnesses, who testify that deceased said that such was the contract, shows that the contract was made. As before stated, the case does not depend upon the testimony of plaintiff alone.

It is thought by appellants that, even

4. WITNESSES: competency: transactions with deceased: burden of proof.

though plaintiff testifies that she took no part in the conversation, still, if her testimony taken together shows that she did participate in the conversation, it and the witness were incompetent under Section 4604 of the Code. Plaintiff testifies that she took no part in the conversation, and she was not interrogated by counsel for appellants further as to this. As said in *Scott v. Brenton,* 168 Iowa 201, the defendants being the objecting parties, the burden is upon them to show that the matter referred to was a personal transaction or communication, and the evidence and witness are not incompetent merely because an inference may be drawn that it was a personal transaction or communication.

It is thought by appellants that plaintiff's conduct was inconsistent with the claimed contract. It seems to us from the entire record that this cannot be so; that her conduct during the 19 years, and that of the deceased himself, was consistent with such a contract, and that it is not unreasonable to believe, from the entire record, that there was such a contract. There is testimony that plaintiff stated, on one or two occasions, that, because the work was so hard, she was going to quit; but she did not. Had she done so, and failed to perform her part of the contract, she would not, of course, be entitled to the relief she asks.

There is testimony from some of the witnesses that deceased said he was going to make a will, and, as we understand plaintiff's position, there was some claim made that deceased was to vest the title in her by will. Other witnesses contradict this. We do not regard this as very material. If deceased agreed to vest the title in plaintiff by will, and failed or refused to do it, she would still be entitled to relief if the contract was made and performed as she claimed.

5. PARTNERSHIP: creation and requisites: profits and losses.

One or two witnesses testify that there was some talk of a partnership, and plaintiff makes such a claim as alternative relief in her petition. But the record does not show that there was a partnership, in the sense that they were to share in the profits and losses. Under the law in this state, this is necessary. See *Lingenfelter v. St..Clair,* 179 Iowa 11, and cases.

As said in 30 Cyc. 357, it is not enough to constitute a partnership that a party prove an agreement in which they call themselves partners; the term may have been used in a popular, rather than a legal, sense, or as a matter of business convenience, and hence no partnership may have been intended by the parties. And again, at page 414, same volume, it is said that the use of the word "partnership" by a person in his testimony, in describing the arrangement between himself and another, is not conclusive against him of the existence of a partnership; but he may show that he used it as a popular, and not as a technical, term.

There is some testimony from some of the defendants' witnesses that, in one or two instances, deceased expressed a desire that his brother Melvin should receive his share of the estate. But the same witnesses testify that there was a contract between plaintiff and deceased, and, as we have already stated, a large number of witnesses testify that

such was the fact. If there was such a contract, and it had been performed by plaintiff, Melvin could not inherit, nor could deceased have willed it to him, because the property would belong to plaintiff.

Some other points are argued, but we do not feel justified in prolonging the opinion. It is urged by appellants that evidence of verbal declarations and admissions is not the strongest kind of evidence. This is the rule where such admissions and declarations are denominated as loose and random conversations, as where the witness does not clearly understand or clearly remember, or the transaction has been so long before that he may have forgotten, and like circumstances. On the contrary, such evidence may be satisfactory evidence. In the instant case, there is a large number of witnesses, many, if not all, disinterested, who state positively their recollection of the testimony, and some of it extends down to a time within a short time before the death of deceased. We have endeavored to apply the rule in weighing the testimony of the different witnesses.

From the entire record, it is our conclusion that the decree of the district court was right, and it is, therefore,— *Affirmed.*

GAYNOR, C. J., WEAVER and STEVENS, JJ., concur.