LULA H. OZIAS, Appellee, v. LOLA L. T. SCARCLIFF et al., Appellants.

**SPECIFIC PERFORMANCE:** Contracts Performable—Parol Contract to Will or Deed Land. A parol contract to will or deed land, followed by possession of the land by the contemplated devisee or grantee, and by the making of valuable improvements on the land by the latter, in reliance on the contract, is specifically enforcible, if the proof is sufficient, in the light of all the circumstances, to carry conviction to the mind of its essential credibility. (See Book of Anno., Vol. 1, Sec. 11846, Anno. 23 *et seq.*)

**Headnote 1:** 36 Cyc. pp. 656, 689.

*Appeal from Buchanan District Court.*—H. B. BOIES, Judge.

NOVEMBER 24, 1925.

ACTION in equity against administrators with will annexed, heirs at law, and legatees, for specific performance of a contract by decedent to give title to real estate by will or deed. From a decree for plaintiff defendants appeal.—*Affirmed.*

*Hasner & Cherny,* for appellants.

*Edwards, Longley, Ransier & Harris,* for appellee.

VERMILION, J.—Prior to 1902, M. D. Ozias, now deceased, was the owner of the land in question, known as the Buckmaster farm, consisting of 280 acres. He owned other farms and other property, his possessions in all being, according to his

own estimate, worth $105,000. His wife was then living, and he had seven adult children: three sons, John L., Charles E., and Edward H., and four daughters.

There is no dispute about certain facts. It thus appears that, from 1897 to 1902, John L. Ozias and his wife, the appellee herein, had been living on the Buckmaster farm, working it and receiving the proceeds, but paying no rent. The brother Charles had been living upon another farm under a similar arrangement. In the spring of 1902, John and Charles went to North Dakota, and entered government land. About the time of their departure, M. D. Ozias had made a will. Whether the sons left because of dissatisfaction with the arrangement they had with their father about the farms, or because they were displeased with the will, is not entirely clear. Both M. D. Ozias and his wife died in 1923, the former leaving a later will, executed in 1914, by which he gave to John a life estate only in the Buckmaster farm.

It is the claim of appellee that, in 1902, M. D. Ozias in writing proposed to John that, if he would return to Iowa, he would give and convey the Buckmaster farm to him by will or deed; that John returned, and orally accepted the proposition; that John continued in possession of the land, made valuable improvements on it, and paid taxes and insurance, all under and in pursuance of such contract, and became and was the actual owner thereof; that, in 1915, John L. Ozias conveyed the farm to the appellee.

It is not questioned that such a contract as is claimed by appellee is enforcible in equity, if the contract is established by clear, satisfactory, and convincing evidence, and is followed by possession of the land by the donee and the making of valuable improvements thereon under and in reliance on the contract. See *Bevington v. Bevington*, 133 Iowa 351; *Baker v. Syfritt*, 147 Iowa 49; *Mohn v. Mohn*, 148 Iowa 288; *Albright v. Albright*, 153 Iowa 397; *Myers v. Myers*, 197 Iowa 1137; *Peck v. Foggy*, 199 Iowa 922.

The claim of the appellee, as presented in the pleadings, depends upon: (1) An offer by the deceased; (2) its acceptance by John L. Ozias; and (3) his possession of the land under the contract, and the making of valuable improvements thereon by

him in reliance upon the contract. The sufficiency of the proof upon each of these propositions is challenged by appellants.

I. Shortly after the departure of John and Charles for North Dakota, the father wrote them about the will he had made, in part as follows:

"Well boys I saw a letter written to Ed dated April 15th at Donnybrook, N. D., and I think that if you boys would have come and seen me, that you would have felt quite different. Now in regard to the will that I have made, I took up the matter with good advice. * * * So we went to work and we think that we have made a good fair division of the estate. The will reads like this: John gets all the land that I own in Section 9 and 4 [the farm in question] and for services rendered after 21 years of age $4,200.00, the land was put in at $40.00 per acre and in the first place we had to make an estimate so as to see what the estate was worth we find that the estate is worth one hundred and five thousand dollars. So we called each share $10,000 which there are seven shares. Now there is only seventy thousand dollars disposed of. If I should die before mama does, and then in that event mama would get all the land that lays north of the main road and one thousand dollars in cash of the first money that comes in the executors hands. She has full control of the land and one thousand dollars her lifetime. She has no dower whatever in the estate, and when she dies whatever is left will be equally divided among the children. Charles gets all the land that I own in Section 3 and 10 about 253 acres and gets $400.00 for over time, and his land is valued $50.00 dollars per acre. Ed gets all the land that I own on the south side of the road and that is valued at $60.00 per acre."

The letter mentions legacies of $10,000 in money or property to each of the four daughters, and continues:

"Now you two boys have had those two farms since you were married and have had the use of them, and I have helped you whenever you needed help, and the Girles will not get theirs until after I die."

John thereafter wrote often and voluminously to his father, protesting against the will; saying that the home farm had been promised to him, that he wanted only a life estate in it, that the estate should be kept together, that he had worked

hard, and helped his father accumulate the property, and his sisters had done nothing; objecting to the provisions made for his sisters; abusing them and their husbands, and also his parents; demanding that his father revoke the will; and threatening to commit suicide.  On October 3, 1902, the father wrote John as follows:

"I am really sorry that you have taken such a stand in regard to that will that I have made I thought when I made it that it was the best thing to do, so that Each one would know Just what belonged to them.  Now Charles was moving that house on the Wilder farm down to his own house to make a tenant house out of it and I wanted him to know that he was doing it on his own land. * * * In my letter to you I gave you a full statement of the Will. * * *  I wanted you boys to know how it was so that you could go on and do as you pleased with the farms."

On October 16, 1902, he again wrote John, saying:

"Now there is no use in your writing so many letters to me in regard to your Grivances as we cannot do business when you are not here now I have written I think three or four letters to you stating Emphatically that you should come back here and that we would fix it so that I think that you will be perfectly satisfied, and the last letter I wrote you, you never opened it. * * * I am not going into details of your correspondence in your lengthy letters, when I say come home. I mean just what I say. You asked me to go and get that will I have done so, now you come home. * * * I never drove you off to N. Dakota, or no place else you went there with your own free will, so I say come home. * * * You can have the 200 acres on the north side of the road of [or] you can have the Drug store with the name Ozias 1893 or any other place you may designate. It makes no difference to me, nor either did it make any difference when I made the will I just thought, that you would rather have that land that you was on and that you could go on and make such improvements as you wanted to and that you would know that you was putting them on your own place and not for someone else, and that you could beautify your home as you wished to. Now this is all that I can do. When I went up to Charles Ozias and saw them loading that house on rollers

I knew that it would take some money to fix it up so that it would be tenantable, so I was glad that I had fixed it so that he was doing it for his own benefit and no one else.''

There is testimony from the sons, Charles and Edward, to the effect that the father said he had made deeds to John and the other sons for the land given them in the will, which were to be recorded after his death. It was objected that these witnesses were incompetent to so testify, under Section 4604, Code of 1897 (Section 11257, Code of 1924). Although the interest of the witnesses was opposed to the claim of appellee, on whose behalf they testified, we have held that that fact does not lift the bar of the statute. *In re Will of Martin,* 166 Iowa 233.

But, without considering such testimony, we are of the opinion that the letters of the deceased sufficiently establish a proposition from M. D. Ozias to give John the land in question, which, if accepted by John and followed by possession and the making of valuable improvements on the land in reliance thereon, would constitute an enforcible contract to perfect the gift by will. The will to that effect was already made. The language of the letters is susceptible of no other construction than that he expected John, if he was willing to accept the provisions of the will, to improve the farm as his own. He said that John could go on and make such improvements as he wished, and know that he was putting them on his own place, and not for someone else.

II. The appellee testified that, within a week after John's return from North Dakota, M. D. Ozias visited him at the Buckmaster farm, and she overheard, but took no part in, a conversation between them; that the conversation continued for some time; that John held out for quite a while for the home farm; that the father said the mother would like to have that during her lifetime, and John finally said, if she wanted it, let her have it,—that he did not want something she had set her heart on, that the father told John that the Buckmaster farm was as good as any he owned, and that John had been there about five years, and finally convinced John that it would be best for him to accept that; that the father said, ''Well, then, I will make a deed to you and put it where it can be gotten at in my

box after my death, and it can be put on record then;'' and that John said that was satisfactory.

We have often recognized the inherent weakness of this class of testimony, depending, as it does, for its competency upon the claim that the witness took no part in the conversation, and possessing all the infirmities arising from interest, the frailties of memory, and the impossibility of contradiction. We have said that it is the special duty of the court to scrutinize such testimony closely, and put it to every test of credibility available in the record. *Peck v. Foggy,* supra.

There is no fact or circumstance established by the evidence that unequivocally indicates the falsity of this testimony. It. is true, many statements in the letters of John to his father exhibit his dissatisfaction with the will generally, and especially with the provisions made for him, and his determination not to return. Yet the undeniable fact remains that at some point, for some reason or upon some inducement, he changed his mind, and did return to the Buckmaster farm, and remained there, or in control of it, for over twenty years. John L. Ozias testified:

''What my father said in the letters of April 20th and in the two written in October, 1902, is what induced me to come back and go on the land again.''

A witness who lived on a farm adjoining the Buckmaster farm testified that, in about 1907, he asked M. D. Ozias about a line fence, and that:

''He said I would have to see John,—he was the man to look after it; that he had made an arrangement with him; and that I would have to see him about it. He said that John was the man that was to own the place; * * * that he intended to give John the place.''

It is shown that John paid the taxes. In many instances checks therefor were signed ''J. L. Ozias, by M. D. Ozias.'' Insurance premiums were paid the same way. The policies were payable to the father until four or five years before his death, when they were made payable to John. It is not disputed that John rebuilt a granary, fixed over a hog house and barn, and built an addition to the house on the farm after 1902. The barn burned in 1912. The father collected $600 insurance, which he turned over to John, saying that this would not build a new

barn, but would help pay for the material. A new barn was built. The father made a contract in John's name for the work and material, but John paid for the building of the barn.

It appears that, during the absence of John in North Dakota, the personal property on the farm was sold. After his return, he bought stock, grain, feed, and implements, and took them upon the farm. He lived upon it from his return till in 1913. In that year, the farm was rented. The lease was signed by M. D. Ozias, as landlord; but it fairly appears that the rent was collected by the father's agent and turned over to John, who paid a commission for its collection. John returned to the farm in 1914 for a year. In 1915 he bought another farm, and conveyed the Buckmaster farm to his wife, the appellee. It is undisputed that thereafter until the death of M. D. Ozias, John rented the farm for his wife. In 1913 John wrote a letter to his father, in which he said:

"You have $800 now of my money in that new barn. The way things are going and the amount of influence around you it looks as if I will come out at the little end of the horn. I have been imposed upon all the way along and I don't believe now you intend to do the right thing by me."

The statement that the father had $800 of John's money in the barn, in connection with the accompanying complaint, and the expressed doubt of the father's present intention, are not necessarily contradictory of the claim that the improvements made on the farm had been made by John in reliance on the claimed contract. There is testimony that, shortly after the death of his father, John complained that the will his father left was unjust, in that he was given but a life estate in the farm, and at that time made no claim that it belonged to him or the appellee. This complaint, in view of the fact that John did not have the legal title, but only claimed a contract whereby he was to receive it by deed or will, is entirely understandable, and not necessarily inconsistent with such claim. If he had such a contract, and had made improvements on the strength of it, the injustice of the will is apparent.

We have said that, in order to award title to a plaintiff upon a parol contract, the court must be able to say that the evidence is sufficient, not simply to make out a prima-facie case, but

sufficient, in the light of all the circumstances, to carry conviction to the mind of the court of its essential credibility. *Peck v. Foggy,* supra. We have also said that:

"The law requires nothing more than that the result shall not be reached by a mere balancing of doubts or probabilities, but by clear and unequivocal proof of facts upon which a court or jury may reach a reasonably satisfactory conclusion." *Bevington v. Bevington,* supra.

When we consider that the deceased made in writing the statement and proposition that he had made a will giving the farm to John, to the end that he might know what he was to have, and could improve it as his own, and that it is only John's acceptance of the proposition that depends upon parol evidence, and that John did return to the farm and make valuable improvements upon it, we think the testimony of appellee stands judicial scrutiny, and, in connection with the other facts and circumstances shown, presents the clear and convincing proof required to establish the contract.

III. But it is said that the possession and the making of the improvements must be clearly referable to the alleged contract. We have so held. *Myers v. Myers,* supra, and cases there cited.

Under the record, we think this requirement is fully met. John did not merely continue in his former possession under the prior arrangement for the rent-free use of the land. The record fully warrants the conclusion that he had left the farm and the state, and was induced to return only by the proposition of the father that he would make a satisfactory arrangement to give him land that he should have and improve as his own, and that he finally accepted the land upon which he had previously been living, under such arrangement. We think his possession thereafter and the improvements made are, under the testimony, clearly referable to the contract, and afford such consideration for the promise of deceased to give him title to the land by deed or will as that it is enforcible. *Bevington v. Bevington,* supra; *Albright v. Albright,* supra; *Partello v. White,* 197 Iowa 24.

The decree is, therefore,—*Affirmed.*

FAVILLE, C. J., and STEVENS and DE GRAFF, JJ., concur.