FRED J. FORD, Plaintiff, Appellee, v. W. C. YOUNG et al., Defendants, Appellants, FRANKIE THOMSON et al., Defendants, Appellees.

No. 44514.

C. A. Robbins and H. L. Bump, for defendants, appellants.

Chas. D. Vanwerden and Hamilton & Webster, for plaintiff, appellee.

Jno. N. Hartley, guardian ad litem, for defendants, appellees.

Kintzinger, J.—The record shows that plaintiff's father and mother, Mr. and Mrs. Richard Ford, separated about the year 1907. Thereafter plaintiff, with several brothers and sisters, lived with his father, Richard Ford, until about March 1, 1913, when his father decided to break up housekeeping. At that time the plaintiff herein, Fred Ford, was the only child remaining at home with his father.

The record also shows that at that time James M. Young and his wife were living on a nearby farm in Madison County, Iowa, and had no children. At that time plaintiff was about 13 years old.

In Count I of his petition appellee alleges that in 1913 his father, Richard Ford, a neighbor of James M. Young, made and entered into an oral agreement with said James M. Young, whereby Young agreed that if Richard Ford would turn over the care of Fred Ford, the plaintiff, to said James M. Young, and that if the plaintiff would live and remain with said James M. Young until he became 21 years of age, he, the said Young, would leave all of his real and personal property to plaintiff after Young and his wife were through with it. This was denied by the defendants.

The record shows that in 1913 there was some talk between Richard Ford, father of plaintiff, and said James M. Young for the purpose of having the plaintiff herein live in the home of James M. Young as a member of his family. No adoption papers were made out at that time, but plaintiff alleges that said James M. Young and Richard Ford, plaintiff's father, entered into said agreement for the benefit of this plaintiff.

The record shows without dispute that the plaintiff herein was taken into the family of James M. Young, and that he lived with him and his wife as their son until after he became of age. The record also shows that during practically all of that time he did much of the work on the Young farm, and during the latter part of his minority did a man's work thereon.

In Count II of his petition plaintiff alleges that sometime after he attained his majority he became married and moved to Kansas City, where he lived until 1931, being employed at a lucrative salary and having a good position. · He further alleges that at that time said James M. Young asked plaintiff to return with his family to live on the farm, and that if he would do so Young would immediately .give him one-half of all of the personal property on the farm, and at the time of his death would leave him all of his real and personal property.

The record shows that James M. Young's wife died on or about July 8, 1930, and that James M. Young died on or about May 24, 1937; that at that time he was possessed of certain real and personal property enumerated in plaintiff's petition; that at the time of his death, James M. Young left no spouse or children, but the defendants herein are his collateral relatives.

The record also shows that shortly after the agreement alleged to have been made, referred to in Count II of the petition, was made, plaintiff removed with his family from Kansas City to the James M. Young farm in Madison County, Iowa, lived there and made a home for him until after his death. The record shows that during the time plaintiff lived there, he performed practically all the work and business of the farm.

The defendants deny that said James M. Young ever entered into the contracts alleged in Counts I and II of plaintiff's petition; and for a further defense allege that, after the death of James M. Young, plaintiff filed a petition asking that a certain purported will, alleged to have been executed by James M.

Young, be admitted to probate; and that because of his action in so doing he was barred from claiming any benefits under the alleged oral agreements referred to in Counts I and II of plaintiff's petition.

The lower court found in favor of plaintiff and entered a decree granting the relief prayed for; hence the appeal.

I. Appellants contend that the court erred in holding that there was sufficient evidence to establish the alleged contract with Richard Ford in 1913 for the benefit of plaintiff.

1. It is first contended that the contract was not established because no witness testified to being present when the contract was made. Appellants cite a few cases which they claim establishes this rule in Iowa. Among the cases cited are: Long v. Kline, 222 Iowa 81, 268 N. W. 150; Black v. Nichols, 213 Iowa 976, 240 N. W. 261; Boeck v. Milke, 141 Iowa 713, 118 N. W. 874, 120 N. W. 120.

An examination of these cases will disclose that no rule was ever announced by this court tending to show that it was necessary to produce any witnesses who heard the original agreement made. An examination of the above cases will also show that there was no testimony therein tending to show, by witnesses present, that such a contract was made.

On the contrary, it seems to be the well-settled rule in this state that oral evidence of the execution of an oral contract, which has been performed or partially performed by one of the parties, may be introduced in evidence. Bevington v. Bevington, 133 Iowa 351, 110 N. W. 840, 9 L. R. A. (N. S.) 508, 12 Ann. Cas. 490; Kisor v. Litzenberg, 203 Iowa 1183, 212 N. W. 343; Stiles v. Breed, 151 Iowa 86, 130 N. W. 376; Horner v. Maxwell, 171 Iowa 660, 153 N. W. 331; Garman v. Wettengel, 199 Iowa 1150, 203 N. W. 266; Ozias v. Scarcliff, 200 Iowa 1078, 205 N. W. 986; Francis v. Francis, 180 Iowa 1191, 162 N. W. 839; Houlette v. Johnson, 205 Iowa 687, 216 N. W. 679; Finger v. Anken, 154 Iowa 507, 131 N. W. 657; Chehak v. Battles, 133 Iowa 107, 110 N. W. 330, 8 L. R. A. N. S. 1130, 12 Ann. Cas. 140.

In Sharpe v. Wilson, 181 Iowa 753, l. c. 755, 161 N. W. 35, l. c. 36, although deciding the issues in favor of the defendants, this court said:

"The right of these plaintiffs to recover upon proof of

the allegations made is no longer a mooted question in this state. See.Stiles v. Breed, 151 Iowa 86, 130 N. W. 376; Horner v. Maxwell, 171 Iowa 660, 153 N. W. 331; Finger v. Anken, 154 Iowa 507, 131 N. W. 657. The disposition of this case, therefore, involves no unsettled question of law. It resolves itself into a fact controversy alone. This question presents itself: Have these plaintiffs established the rights claimed by them by such a quantum of proof as the law requires of them in cases of this kind? It is the holding of this court that such an agreement as here sought to be enforced, resting as it does on parol, must be established by clear, satisfactory and convincing evidence. Some courts hold that such a contract is looked upon with suspicion, and is only sustained when established by the clearest and strongest evidence. Other courts hold that the proof of such a contract must be so cogent, clear and forcible as to leave no reasonable doubt in the mind of the chancellor as to its terms and character. Our latest pronouncements approving this rule are Boeck v. Milke, and cases therein cited, 141 Iowa 713, at page 717, 118 N. W. 874; Stiles v. Breed, 151 Iowa 86, at page 91, 130 N. W. 376.''

In Bevington v. Bevington, 133 Iowa 351, l. c. 360, 110 N. W. 840, l. c. 843, 9 L. R. A. (N. S.) 508, 12 Ann. Cas. 490, this court in discussing this proposition said:

''Where a large number of persons testified to statements made by the owner of land in his lifetime to the effect that he had given the land in question to plaintiff, and * * * that plaintiff went into possession and expended $1,100 in improving the property, the gift was held to be sufficiently established, although the mother and other members of the family testified that they had never heard of the gift, and that the father had always spoken of the property as his own, and that he used a stable on the land for keeping his own cow and horse.''

In that case this court, in quoting from Loney v. Loney, 86 Md. 652, 38 A. 1071, (133 Iowa 351, l. c. 360, 110 N. W. l. c. 843) said:

'' 'The evidence of the many witnesses who testify distinctly and positively to the old man's declarations to this point requires that we should believe it.' * * * Then, after referring to the entry of the donee into possession and the making of im-

provements, the court proceeds: 'This action on his part consummated his title in equity and it could not be affected or defeated by subsequent statements or conduct by the giver.' As to the sufficiency of admissions and statements by the alleged donor as evidence of a gift, see, also, our own case of Franklin v. Tuckerman, 68 Iowa, 572, 27 N. W. 759.''

In Stiles v. Breed, 151 Iowa 86, l. c. 91, 94, 130 N. W. 376, l. c. 378, this court said:

''That a contract such as alleged may be enforced was decided in Chehak v. Battles, 133 Iowa [107] 117, 110 N. W. 330, 8 L. R. A., (N. S.) 1130 [12 Ann. Cas. 140]. There the contract was in writing, while in this case oral evidence is relied on. The only difference is in the manner of proof. Such an agreement, if resting in parol, must be fully established by clear, satisfactory, and convincing evidence. * * * The evidence is conclusive that plaintiff complied with all the terms of this alleged agreement, and greatly endeared himself to his foster parents. They loved him as an own son, and though, upon attaining twenty-one years of age, he left them to follow a pursuit he had chosen, he kept in touch with them through correspondence as long as they lived. They uniformly referred to him as their son, and freely expressed their intention that he should have their property after they had departed this life. While this may indicate a future purpose, it is entirely consistent with the alleged agreement, and, as it relates to the same subject matter, should be regarded as somewhat corroboratory thereof, especially when the expression of the intention that he was to have their property was mentioned in connection with his adoption.''

In Houlette v. Johnson, 205 Iowa 687, l. c. 689, 216 N. W. 679, l. c. 680, we said:

''Foundation for the right claimed may be based upon a parol contract. Hurst v. Jenkins, 161 Iowa 414, 143 N. W. 401; Lynch v. Coolahan, 177 Iowa 179, 158 N. W. 550. In Hurst v. Jenkins, supra, [page 416 of 161 Iowa, page 403 of 143 N. W.] we said:

'' 'It is well settled that a parol agreement to perform such services is a sufficient consideration to support an agreement for the transfer of title of real estate; and if the agreement is established by the quantity and quality of evidence required in

**962**

such cases, and there has been a performance of the contract, the agreement is binding and enforcible.' "

To the same effect are the other cases hereinabove cited.

We are constrained to hold that the alleged oral contract made by James M. Young with Richard Ford can be established by parol evidence of witnesses, although they were not present at the making of the oral agreement.

2. Appellants also contend that the oral agreement must be established by clear, satisfactory, and convincing evidence. This may be conceded to be the settled rule of law in this state. In discussing the applicability of this rule, this court, in an opinion written by the late Justice Evans, in Garman v. Wettengel, 199 Iowa 1150, 203 N. W. 266, said:

"This case belongs to a class which usually challenges the scrutiny and the skepticism of the court. The evidence upon which such a case usually rests is such, in its very nature, that direct disproof is quite impossible. The defendants must rely largely upon circumstances of inconsistency and improbability. Such case imposes upon the court the special duty of receiving the direct testimony relied upon by plaintiff, subject to every fair test which tends to weaken its credibility. Such is the rule contended for by appellant here. * * *

"Upon a careful and skeptical reading of this record, we have become convinced that the plaintiff's claim is not lacking in substantial merit; that there was an arrangement of some kind between her and Miller that accounted for her devoting 15 years of her life to his comfort. The equities behind the plaintiff's claim are strong enough to warrant their acceptance as corroboration of the direct testimony in the record, in support of such claim."

It therefore becomes necessary to consider the evidence for the purpose of determining whether or not the evidence offered in this case does establish the making of the oral agreement between James M. Young and Richard Ford with such clear and convincing force as to justify the allowance of plaintiff's claim.

J. M. Young and his wife had no children and were residing in the country near Winterset, Iowa. The Ford family were near neighbors. The record shows that on his way to and from school Fred Ford passed through the barn lot of Mr.

Young; that Mr. Young and Fred became very much attached to each other, and when Fred's father, Richard Ford, was breaking up his home he and Young had a conversation about raising Fred, the plaintiff herein.

The witness Brock, one of Young's neighbors, testified that in a conversation with Mr. Young in March, 1913, he asked Young: " 'How do you happen to have that boy?' 'Well,' Jim says, 'Dick and his wife separated, and Dick was breaking up housekeeping,' and he told Jim if he would take this boy, he could have him and adopt him, and Jim says, 'Well, I don't want to adopt any child because I have saw trouble, but,' he said, 'if Fred will stay with me until he is 21;' I heard him and Mollie both tell it, 'they will get everything we have got, after our death,' because, he said, he did not care for his brothers and sisters. That is what he told me."

"Q. State whether or not Jim Young told you at that time that he had made that agreement with Dick Ford? A. Yes, sir, that he had made that agreement with Dick. Later on, * * * Mollie was down there, and Mollie told my wife that Fred and his children would get everything when her and Jim was dead."

Mrs. Nettie Leonard, another witness, who was a sister of Jim Young's wife, testified that sometime after March 1, 1913, Jim Young told her in substance that: "Dick Ford gave Fred to me. When I took Fred to raise, Dick Ford and I made an oral agreement that if he would give Fred to me, I would take the boy and raise him as my son and if he stayed with me until he was 21 years of age he was to get all the property we had after Mollie and I were through with it."

Plaintiff testified that he overheard a conversation between Mr. Young and Richard Ford, his father, sometime in 1921; that he had no part in the conversation, and testified that as he was working on an automobile he heard Mr. Young say to his father, "If anyone can fix that car, Fred can." His father said to Mr. Young, "How is the boy doing?" Mr. Young said, "He is just doing fine. I couldn't ask for a better boy. That old contract I made with you where he gets everything when I am through is standing like a stone wall."

Roy Ford, a brother of plaintiff, testified that in a conversation he had with Jim Young in 1923, Young said, in referring to a slight altercation between himself and Fred: "I

never have laid my hands on that boy, and I never expect to. I don't have to. I am still holding to my old agreement. If Fred stays with me and goes ahead like he ought to, all this belongs to him when I am through with it. That is the agreement I made with your father."

The witness Claude Hope testified that he had visited Young on numerous occasions; that at one of these times while Fred was in Kansas City Young told him that he had become very fond of Fred when the boy was passing through his lots on the way to and from school; that he talked to his wife Mollie about taking Fred to raise, that she was pleased with the idea, and that he then went over to Dick Ford and told him that if he would let Fred come over and live with them he would make him a home and give him the best home that he could under the circumstances; that if Fred would stay with him until he was a man, if there was anything left when Young and his wife were done with it, he would give it to Fred.

Roy Preston, another witness, testified that in 1932 Young had told him that when he was through with his property, he was going to give Fred everything.

Mr. Monegan, another witness, testified that in a conversation he had with Jim Young in 1936, in which Young told him that because of trouble in the Richard Ford home Dick had offered to turn the boy over to Jim Young to raise, that Young said he had asked Ford on what conditions he wanted him to take Fred and he said, "Any way that he can have a good decent home like any other boy," and Young then told Monegan that he had agreed with Dick Ford that, if Fred would come over and stay with them and be a son to them and do as he should, he would feed and clothe him good and give him the best care possible and treat him just as he would if he were his own son, and that if Fred would stay with him until he was of age Fred could have everything they had left after he and his wife were gone. Monegan also testified that the stock on the farm was in excellent condition and that Fred seemed to be directing most of the business.

Rueben Lecocq, another witness, testified that in the spring of 1937 Mr. Young told him he had raised Fred from a small boy and that when he got through with his property everything was Fred's anyway and whatever Fred did concerning buying a tractor would be all right. This witness further testified that

Jim Young frequently spoke to him about Fred being the only person he had to stay with him, and take care of him, and that Fred was a good worker.

Numerous other witnesses testified as to how Fred stayed on the farm with Mr. Young, how hard he worked, and that he did most of the managing of the business and practically all the heavy work on the farm.

The evidence tends to show that after Fred Ford moved to Kansas City Mr. Young asked him to come back and live with him. The record also shows that at that time Fred Ford had a good position in Kansas City, but in response to Mr. Young's request he and his family moved back onto the farm with Mr. Young.

The testimony also shows without dispute that Fred, his wife, and family moved back to the Young farm near Winterset, Iowa; it also shows that after that time most of the work and business on the farm was performed and conducted by Fred, and that Fred and his wife furnished a home for Mr. Young and took good care of him until he died in 1937.

The record also shows that on or about May 29, 1937, Fred filed a petition for the probate of a will alleged to have been made and executed by James M. Young, deceased. The record shows, however, that this petition was withdrawn within thirty days after it was filed. Appellant contends that the filing of such petition for the appointment of an executor and to probate an alleged will of James M. Young was so inconsistent with the claim here made that it tends to show that no such oral agreement was made, and that the filing of such petition for the probate of the alleged will of James M. Young estops plaintiff from now making any claim under the contract. The alleged will of James M. Young, however, was signed by only one witness and was never probated.

The evidence shows without dispute that the signature on the alleged will was that of J. M. Young. An examination of this alleged will, without setting it out in detail, shows at least that it was Mr. Young's intention by this will to leave his entire estate, both real and personal, partially to the plaintiff in this case and partially to plaintiff's children. It also shows that he had no intention of leaving any of his property to the defendants or any of his relatives; he had no interest in them

966

whatever. The fifth paragraph of the alleged will specifically provides as follows:

"I intentionally make no provision for any of my brothers or sisters or any other heirs now living or that may be born hereafter, believing that their welfare will be best subserved by the disposition herein made of my estate."

Without setting out in detail the terms of the will, it is sufficient to say that the alleged will attempts to devise and bequeath his entire estate to Fred Ford and his family, and as stated in paragraph 5 of said alleged will, he makes no provision whatever for any of his relatives or any of the defendants herein.

It therefore appears from this alleged will that it was not the intention of James M. Young to leave any of his property to any of his immediate blood relatives. On the contrary, the statements made in the purported will are corroborative of the claim made by the plaintiff rather than contradictory or inconsistent therewith.

There is no probative evidence in the record of any direct negative character tending to disprove the making of the contract alleged in Count I.

Appellants earnestly contend that under the facts and the rule announced in Sharpe v. Wilson, 181 Iowa 753, 161 N. W. 35, the ruling of the lower court in the case at bar is erroneous. We have carefully examined that case; and, although it may bear some similarity to the facts herein, a careful examination thereof will disclose that there is much more evidence in this case tending to establish the making of the oral agreement alleged in Count I of plaintiff's petition than there was in the Sharpe v. Wilson case.

We have hereinabove set out much of this testimony, but without setting it out in further detail, we are constrained to hold that the lower court was right in finding that the alleged oral agreement contained in Count I of plaintiff's petition was entered into between James M. Young and Richard Ford for the benefit of plaintiff.

We recognize the rule that in this kind of case the evidence should be clear, satisfactory, and convincing; but after a careful reading of this record we are convinced that plaintiff's claim has been established by sufficient proof to meet the legal

requirements. It is therefore our conclusion that the lower court was right in so holding upon Count I of his petition.

In view of the conclusion hereinabove reached, it will be unnecessary to consider or determine the claims made by plaintiff under Count II, for the simple reason that under the agreement alleged to have been made in Count I, the plaintiff, having fully performed all obligations under the contract made for him by his father, is entitled to all of the property which it is claimed James M. Young died seized of.

For the reasons hereinabove expressed, the judgment of the lower court is hereby affirmed.—Affirmed.

SAGER, C. J., and HAMILTON, STIGER, DONEGAN, ANDERSON, and MILLER, JJ., concur.