AGNES LYNCH, Appellee v. WILLIAM COOLAHAN, Appellant.

GIFTS: Contract to Give—Performance—Evidence Required—Gifts Inter Vivos. Contracts to care for and support a relative, in return for the relative's property, demand proof which is clear, unequivocal and definite, and the acts said to constitute perform- ance must be equally clear and definite, and referable exclusively to said contract. Evidence reviewed, and held to establish the contract alleged.

*Appeal from Linn District Court.*—F. O. ELLISON, Judge.

THURSDAY, JUNE 29, 1916.

SUIT to quiet title in 80 acres of land. A cross-petition was filed, praying that relief be denied plaintiff and title be quieted in defendant. On hearing, the cross-petition was dismissed and title quieted in plaintiff. The defendant appeals. —*Reversed.*

*J. M. Gray, Redmond & Stewart* and *F. L. Anderson,* for appellant.

*Tourtellot & Donnelly,* for appellee.

LADD, J.—The parties hereto are brother and sister, being nephew and niece of Michael Coolahan, who died September 17, 1913, at the age of over 90 years. His wife had departed this life in 1901, and, in May of that year, William Coolahan, accompanied by a daugh- ter, in pursuance of some arrangement with Michael, moved on the premises in dispute. A little more than a year later, William married, and two

rooms were set apart for Michael. He occupied these and boarded with William and his wife and was cared for by them until September 26, 1911. On that day, he went to live with plaintiff, where he remained until his death. He conveyed to her the 80 acres occupied by William, November 12, 1912. A short time afterwards, he assigned to her a note of $800, executed to him by one Stark, and in June, prior to his death, made his last will, bequeathing to her all his property, then consisting of nearly $1,000, deposited in a bank. The plaintiff's action to quiet is based on decedent's conveyance to her. The validity of the deed is assailed by the answer, but the evidence is insufficient to sustain the allegations with reference thereto. The sole issue for determination was raised by the cross-petition, in which defendant alleged that he entered into an agreement with decedent in 1901, shortly after the death of decedent's wife, by the terms of which William was to move onto and occupy the premises and make a home and care for decedent as long as he should live, and decedent, in consideration thereof, should give William said land; and that, in pursuance of such agreement, defendant moved onto the premises and made a home and cared for Michael Coolahan until he went to the plaintiff's home to live; that Michael Coolahan left defendant and his wife without cause, though they were ready and willing to fulfill said contract to the end; that defendant delivered to decedent a portion of crops in accordance with said agreement, and defendant alleged complete performance on his part and prayed that title be quieted in him, and other appropriate, equitable relief. The reply put these allegations in issue. The burden is on the defendant to establish the agreement alleged, by clear, unequivocal and definite evidence, and the acts said to constitute performance should be equally clear and definite, and referable exclusively to said agreement. *Stennett v. Stennett*, 174 Iowa 431. A careful examination of the record has convinced us that the proof meets these requirements. As one party to the contract is dead, and the mouth of the other sealed, reliance, neces-

sarily, was on declarations of decedent in connection with circumstances shown, bearing more or less directly on the issues. There is no dispute that two fifths of the grain raised were turned over to decedent each year, up to 1912, and three fifths retained by defendant. The theory of the latter is that the farm was given, or to be given, for the board and care of decedent, while that of the plaintiff is that defendant was given the use of the pasture and meadow for said board and care. Doubt is cast on this last contention by the undisputed evidence that the pasture and meadow land did not exceed, on the average, 15 acres, and the fair rental was about $3.50 per acre. On the other hand, defendant, as contended, rented the land of decedent at $3.50 per acre in 1912, and his brother bargained for it for 1913 at $5 per acre. Though this may not have amounted to more than the value of two fifths of the grain raised, it recognized terms other than those claimed to have been agreed upon, and is somewhat inconsistent with the theory of a fixed rental during life. Notwithstanding such inconsistency, however, the agreement may have been made. Again, in 1909, decedent executed a will leaving but $1 to defendant, and, after certain legacies, leaving the residue to plaintiff and her husband; but in 1905 he had willed all his property, except $5 for a sister, to defendant, and in 1901 he did likewise, though exacting that he (defendant) pay $500 to each of two brothers and $1 to decedent's sister. His personal property appears to have been sufficient to meet these legacies. The record leaves no doubt that, up to 1909 at least, he intended to leave the farm to defendant. Was such intention because of having so agreed? When defendant moved onto the premises, in 1901, decedent was about 80 years of age, without wife or children. He was in need of someone to provide him personal care and furnish him a home. Defendant was proven to have been his favorite nephew, and what is claimed by the latter was what probably and naturally would have occurred. James Coolahan, a brother of defendant's, remained at home with decedent, who was unable to attend

his wife's funeral, when, according to his testimony, decedent said: "Jimmie, I am living here all alone. If Willie comes and lives with me, I will give him all I got." The witness swore that he told Willie of this conversation, and that Willie immediately went to the place and stayed with decedent.

James Beatty, who had been acquainted with decedent 40 years, and resided only a mile and a half distant from the farm, testified that, in 1901, decedent inquired which of two wills would prevail when a man made more than one, to which he answered, "It was usually the last one;" and that decedent then said, "Well, I give Willie that 80 for keeping me, and he is to move over in the house and I am to have one room;" that the witness asked if he was "going to give the other two boys something," to which decedent responded: "I am not. I give it to Willie. He is a nice, clean young man." Cross-examination: "He said he had given the farm to Willie for keeping him . . . he talked that way. He had willed it to Willie."

Sam and Andy Hutten drilled a well on the premises, probably in 1908. Sam testified that, when talking at the dinner table one day, decedent said that the place was Willie's; that he, Michael, was going to live there as long as he lived, and the place was William's when he got done with it; that he willed it to him. "He told me he gave it to him. He said Willie would pay for the well; it belonged to him anyway. . . . He said he would live there as long as he lived, and gave the place to Billy."

This was corroborated by Andy, although in somewhat different language, and also by O'Hara and defendant's daughter, as well as his wife, who testified to having taken no part in the conversation. Several witnesses testified that the reputation of the Huttens for truth and veracity was bad, but, as seen, they were corroborated, though by interested witnesses. Faucett, who was cashier of the bank at which decedent did his business, testified that the decedent and

Willie were in the bank talking about some improvements put on or to be put on the place, when the former said to Willie, "Go ahead and do what you want to. The place is to be yours;" and that at another time the decedent had said that Willie came there to keep him and take care of him. Willie was to have the place. The witness further testified:

"He said all along there that was the way it was to be, not necessarily by will. . . . I know he said the farm was to be Willie's—he said that from the time Willie went on there for a number of years after; for how long I could not say."

Later on, decedent inquired of the witness where he could get a farm if he sold this one, and he had tried to persuade him not to sell. George Hoppel, a merchant with whom defendant did business, testified that he had heard decedent say, about the time of his wife's death, "If Willie comes and takes care of me I will will Willie my farm;" that he subsequently referred to this, and several times remarked: "It is Willie's place; he can do what he wants to."

The father of defendant's wife's father, O'Hara, also testified that decedent had said to him that he "gave the place to Willie, that it belongs to Willie after he died, all he had to do was to keep him, Michael, while he lived." On cross-examination, the witness swore that decedent had told him that "he gave it (farm) to Willie and Mary (Willie's wife)," that "Willie was going to keep him but he had to pay rent."

To Farral, Axleton, Roths, Hosmers and Mr. and Mrs. Odled, he declared, in substance, that the farm was William's. John Coolahan, a brother of defendant's, testified that, about the time defendant moved on the farm, decedent had said that, if Willie would come and take care of him and live with him, he would give him "all he got—give him all he had; and I told Willie what my uncle had said, and Willie went and lived with him;" that subsequently decedent had

told him he had given the farm to Willie; that it all belonged to Willie, and that Willie would care for him as long as he lived.

Weare testified to his acquaintance with decedent for several years, and that he heard him say at times, "The farm belongs to Willie," and at others, that he "calculated to give the farm to Willie." The daughter of defendant also testified that she had heard decedent say frequently that he had given the farm to her father, and defendant's wife testified to having heard a conversation in 1908 between Lizzie Wykoff, defendant's sister, and decedent, in which she inquired what he was going to do with his property, and he responded, "It belongs to Willie;" that she heard a conversation between decedent and Willie, June 2, 1912, after he had been living with plaintiff, in which they were speaking about the money owed to decedent for the corn; and that Michael then said to Willie, "Nobody can ever turn me against you, and all I got belongs to you and May; now fix up the place to suit yourself and keep it up and make what you can; this farm belongs to you." She also related that, in the evening after her marriage, he had said to her husband, "Willie, you know I give you this farm. All you and this woman have to do is to care for me as long as I live," to which Willie responded, "All right."

Only excerpts from the record have been quoted, but enough to establish beyond cavil that there was an understanding such as alleged. Doubt was raised as to the credibility of some witnesses, because of their insistence that they had never mentioned to anyone what they testified to, or because of forgetfulness of everything else; but what these witnesses said dovetailed with the testimony of those of undoubted veracity. Considerable of the evidence related to what decedent declared he would do, or expected to do, which, when without suggestion of so doing in pursuance of any contract obligation, could have little probative force. *Stennett v. Stennett*, supra. There was quite enough, however,

not only to prove the agreement alleged, but that decedent was being boarded and cared for in pursuance thereof. Indeed, the evidence referred to was attempted to be met only by the wills alluded to, expressions of dissatisfaction said to have been made by decedent, and his testimony in another case. Certainly, the first two wills cannot be said to have been out of harmony with the alleged agreement. The last two wills tend to show that decedent had changed his purpose, though subsequent declarations inconsistent with that of 1909 were proven. But the theory of defendant is that decedent did change his mind and broke his agreement, and the demand of defendant is that, notwithstanding such breach of contract, he be awarded the pledged fruits of performance. Decedent may have stated matters as testified, about or after the time he went to live with plaintiff, and certainly testified, in an action brought in 1912 by defendant to have a guardian of his property appointed, that he was to give defendant the use of 40 acres of pasture for his board. But there were at no time 40 acres of pasture and meadow on the premises, the evidence being undisputed that there were never over 25 acres, and that the average was less than 15 acres. Decedent had signed defendant's bond as guardian of the estate of his daughter, and, shortly after going to the home of plaintiff, requested to be released therefrom. This tends to explain his course rather than to refute the claim that there was a contract, and defendant's conduct in praying for the appointment finds excuse, if not justification, in the conveyance of the land and the assignment of the Stark note to plaintiff.

That decedent talked about selling the farm, hired two or three washings done away from home, or sometimes expressed his dissatisfaction, owing to disagreements between defendant and his wife, and complained to her daughter of the condition of decedent's clothes when washing, does not, when considered separately or together, prove failure on defendant's part to furnish board and care as required, and nothing in this record indicates that he would not have done

so until the end, had decedent cared to live with him. He chose to live with another, through no fault of · defendant's shown, as he had the right to do, and that other has been amply rewarded for all she did, and we know of no reason for denying defendant that which decedent promised to pay for the board furnished and the care bestowed.

We do not pretend to have set out or even referred to all the evidence contained in the somewhat voluminous record. Enough has been mentioned, however, to indicate the grounds of our conclusion, reached after a painstaking, thorough examination of the record. The contract alleged, and its performances, have been proven as exacted by law, and the relief prayed for by defendant should be, and is, awarded.— *Reversed.*

EVANS, C. J., GAYNOR and SALINGER, JJ., concur.