ROSE HOULETTE, Appellee, v. WILLIAM C. JOHNSON et al., Appellants.

DECEMBER 13, 1927.

REHEARING DENIED MARCH 10, 1928.

 

*Charles J. Haas*, for appellants.

*Johnson, Donnelly & Lynch*, for appellee.

KINDIG, J.—Primarily, the question submitted for our consideration relates to the sufficiency of the evidence to support the purported oral agreement. Preliminary to a further discussion thereof is a rehearsal of the story pertaining to the parties, their relationship, circumstances in life, and dealings with each other in the premises.

Adelaide Johnson, in 1920, owned and lived in a house on the real estate in controversy. With her resided a son, B. F., or Bert, Johnson. The mother was then aged, and the son approximately 52 years old. A day or two before Thanksgiving of that year, at the urgent request of Mrs. Johnson, Bert went to the home of appellee (a long-time friend of the family, but not a relative), three or four blocks away, and implored her to come to the Johnson residence, to attend the old lady as long as she lived, and afterwards to do the housework and care for him during the remainder of his life, saying, at the same time, that, if Mrs. Houlette would do so, Adelaide would convey said property to him, and he, in turn, would will or deed it to appellee. At this date, the latter was occupying her own dwelling, living on a small interest income and a widow's pension of $30 per

month from the United States government. To these entreaties demur was first made; but, upon further importunity, appellee yielded, consented to the arrangement, gave up and rented her abode, and immediately began her services for the Johnsons.

Fulfillment of the undertaking, so far as the parent was concerned, is undenied. Death came to her February 12, 1921. Before this, however, she had properly and conformably transferred said holdings to her boy. · Thereafter, appellee continued to carry on her duties, in performance of the compact, and did so in complete acknowledgment thereof, consummating on December 30, 1925, when B. F. Johnson died, survived by his brothers, William C. and Frederick F., appellants herein. He left no will, nor did he formally convey the lot and improvements to Mrs. Houlette, although he had many times said he had given it to her, and that she was the owner.

Returning now to the problem confronting us, we find little disagreement between the parties over the law.

I. Foundation for the right claimed may be based upon a parol contract. *Hurst v. Jenkins,* 161 Iowa 414; *Lynch v. Coolahan,* 177 Iowa 179. In *Hurst v. Jenkins,* supra, we said:

"It is well settled that a parol agreement to perform such services is a sufficient consideration to support an agreement for the transfer of title of real estate; and if the agreement is established by the quantity and quality of evidence required in such cases, and there has been a performance of the contract, the agreement is binding and enforcible."

II. Consistent with the seriousness of the situation, and in realization of the injustice that might otherwise be done, proof required must be "clear, convincing, and satisfactory," and the "acts said to constitute performance should be equally" plain, "definite, and referable exclusively to said contract." *Chew v. Holt,* 111 Iowa 362; *Groh v. Miller,* 196 Iowa 1367; *Stennett v. Stennett,* 174 Iowa 431; *In re Estate of Rich,* 199 Iowa 902; *Helmers v. Brand,* 203 Iowa 587. Illustrative of this principle involved is the following language in *In re Estate of Rich,* supra:

"* * * * the human mind and memory are subject to much imperfection; and such declarations made years before, not clearly remembered or accurately stated, should be cautiously received. * * * The temptation to set up claims against the estates of decedents where there are no lineal heirs, is very great, and the

testimony should be closely scrutinized. Such claims are not necessarily established because the evidence is not denied.''

III. Like every effort to form a ''contract,'' the essential elements are prerequisites: that is to say, there must be an offer and an acceptance, as well as a legal ''consideration.'' So, in such instances, a mere tender, not made binding by the necessary approval, amounts to no obligation on anyone, and the promisor in such event may change his mind, and make other disposition of his earthly possessions. *McDonald v. Basom,* 102 Iowa 419; *Stennett v. Stennett,* supra; *In re Estate of Rich,* supra. An appropriate sentence in *In re Estate of Rich,* supra, is:

''We have said that the evidence of witnesses indicative of an unexecuted purpose on the part of deceased to make a future disposition of the property lends little countenance to the idea that he had already made such a definite and specific contract to convey as to prevent his changing his mind and refusing to carry out the arrangement if he saw fit.''

IV. However, as before indicated, if the contracting parties have permitted their minds to meet, a mandatory status is created. *Hurst v. Jenkins,* supra; *Lynch v. Coolahan,* supra. And harmoniously, this result may be shown by any competent evidence, including acts and statements. *In re Estate of Rich,* supra, declares on this subject:

''It is true that declarations or admissions deliberately made, clearly remembered, and correctly given, are often satisfactory evidence.''

On this phase of the contention, for the sake of distinguishment, it is well to note that, if the indispensable factors exist, the relief may be granted, even though there is mixed with satisfactory and adequate testimony in the record that which culminates in only a proposition or contemplation of doing something in the future. Applicable at this juncture is this quotation from *Lynch v. Coolahan,* supra:

''Considerable of the evidence related to what decedent declared he would do, or expected to do, which, when without suggestion of so doing in pursuance of any contract obligation, could have little probative force. * * * There was quite enough, however, not only to prove the agreement alleged, but that decedent was being boarded and cared for in pursuance thereof.''

V. Manifestly, the case at bar further demands for its de-

termination a final decision on the facts, applied in the light of the legal doctrine above set forth. Witnesses were called, and their utterances appear upon the abstract as follows: Lee Wixon said:

"I stopped and talked with Bert there once in a while * * *. Once I was there after Mrs. Johnson died. Mrs. Houlette was there, and we were talking, and I made the remark that he ought to go out to California and live with his brother * * *. It would make a better home for him, and he [Bert] said: 'What in hell and damnation did his brother care for him?' He [Bert] said: 'Mrs. Houlette was making him a good home, and was going to look after him as long as he lived.'"

Mrs. Annie Petrusch swore:

"I remember of Mrs. Johnson's being sick. I remember when Mrs. Houlette went up there. She lived in her own home before she went to the Johnson house. * * * Mrs. Houlette was helping take care of Mrs. Johnson. She did the cooking and cleaning and everything what is to be done around the house. She stayed there until Mrs. Johnson died. Bert was sick about that time. I was there when Mrs. Johnson told Rosie to stay and take care of Bert. After his mother died, Mrs. Houlette stayed until Bert died. She did the same thing what she always did,—working around the house and waiting on Bert. When Bert got sick, I was there in the daytime for twenty-three or four days before he died, and took care of him daytimes, from morning until night, and she [Rosie] took care of him like a baby * * *. Bert told me, if I come and help him, he do the best for me he can, and I get my pay, and everything that was his was Rosie's. * * * What he had was Rosie's, and she have to see to it that I got my pay * * *. Q. Did he tell you anything about the work she did there? A. Yes, he said that everything that was his belonged to her when he was gone. Q. Did he say anything about giving that to her for the work that she had done? A. Yes, everything was hers. Q. Did he say anything about that being the house? A. Yes. Q. At any time you were there, did you see Rosie paying for groceries or coal or anything like that out of her own money? A. Yes, she did. She took money from the rent of her house and pension money and bought things. One time, Bert say that Rosie paid her own money out, and paid everything,—it was no more than right that

he give it all to her, and nobody else. Q. Did you ever hear him tell Rosie that it was right for her to have those things when he was gone, or anything to that effect? A. Yes, sir, he say that many times to Rosie. Q. You just tell us what you heard him tell Rosie about him giving her what he had. A. Well, he said everything what is there was Rosie's. Q. Did he tell her that many times? A. Yes, sir, I heard Bert tell Rosie that it was right for her to have those things when he was gone. I heard him tell Rosie that everything he had there was Rosie's. I heard him tell her that many times. Q. Just tell what Bert said about not having Bill [William C. Johnson, appellant] in the house? A. Well, Bert was so sick, and he hears somebody talking, and he say: 'Who is there?' And first I won't tell him, and then he hear it, and he say: 'Is Bill there?' and I say, 'yes,' and then he swear, and say: 'Tell him to get out of there.' He don't want him in the house.''

Archie Berryhill said:

''He [Bert] said that was his mother's request, that she [Rose] should take care of him [Bert] as long as he lived * * * . He said he had went down and got her to come up and live with him, and if she would stay and take care of him the balance of her days, that he would give her this property,— his interest. Q. Did he tell you that he told her that? A. Yes, he said so. * * * Mrs. Houlette was cooking meals, put the coal in the stoves, swept up the ashes, and cleaned around, and helped to take care of Bert. She helped me take care of him and change his clothes. The Odd Fellows furnished a man to take care of Bert during his last sickness. He [Bert] said that she [his mother] requested him to get Mrs. Houlette to take care of her as long as she lived, and then her dying request was begging Mrs. Houlette to take care of Bert, and that Bert had poor health, and was drinking himself to death, and that she could take care of him and manage him. Q. Now he said it was the dying request of his mother that he turn the property to her? A. Yes. Q. And that his mother wanted Rose to stay with her as long as she lived,—that is, as long as Mrs. Johnson lived? A. Yes, he said he made her [Mrs. Houlette] the proposition. She had a place she was living in, and Bert said she did not like to give it up, and that he got her to give up her place and come up there and take care of his mother * * * . And after his mother's

death, or at the mother's death, the mother wanted her [Rose] to take care of Bert the balance of his days. He [Bert] told her [Rose] if she would come up there and take care of his mother as long as she lived, and continue to stay there as long as he lived, she [Rose] could rent her property, and he [Bert] would turn his property to her [Rose] after his death, if she would stay and take care of him until then.''

Verne Edaburn declared:

''I was at the Johnson house frequently, and saw Mrs. Houlette doing the sweeping and scrubbing and general housework. She did that all the time, up until Johnson died. * * * After I had lived there some time, I wanted some chicken wire, and I asked Johnson if he could get me the wire, but he [Bert] said: 'I don't have the money to furnish it. Aunt Rose is furnishing the money for everything here * * * . When my mother was sick, we went down and got Aunt Rose to come and take care of her, and the agreement was, I was to get the property from my mother, and when my mother died, I promised Aunt Rose that, if she would stay and make a home for me, I would give her everything that I had left * * *. Everything that is here, car and all, belongs to Aunt Rose when I am gone * * *.' He told me that his mother had asked Aunt Rose to stay there as long as she lived, and that it was his mother's request to Mrs. Houlette that she stay there and take care of him. He [Bert] said she [Rose] had done that.''

Mrs. Mary Shock added:

''He [Bert] told me that he didn't want his folks to have a damned cent. Aunt Rose was all there was to him, and she was the only one that had helped him day and night. He said she was to have all his property. He told me she was taking care of him, and paying for everything. I was there and heard some talk about cutting a tree down. He [Bert] says: 'Aunt [Rose], do you want that tree cut down? I don't want it. You have to say whether you want the tree cut down or not.' He said: 'You have got as much to say as I have about this thing. This place is going to be yours * * * .' Once he asked me if I had some small grape vines, and I told him I had. He said: 'Well, bring me two or three,' and I took him up two or three little plants, and he said: 'Now Aunt [Rose], I want you to come out and tell me where to put these plants. You are to

say where they are to be put, for this place is yours,—is to be yours.'"

Mrs. Houlette remained in possession after Bert's decease, and ever after has continued her habitation therein. Clearly, the requirements have been met, the "contract established," and its "performance" shown. While variations may appear in some of the assertions, through cross-examination or otherwise, yet substantially each witness remained unshaken, and, as was aptly put in *Lynch v. Coolahan*, supra:

"Considerable of the evidence related to what decedent declared he would do or expected to do * * * . There was quite enough, however, not only to prove the agreement alleged, but that * * * " appellee was at all times operating " in performance thereof."

Comprehensive in every way, the "agreement" is definite, clear, and certain, both in its institution and the timely discharge thereof. No more can be demanded. Section 11257 of the Code of 1924 silenced the lips of appellee, while death forever sealed those of Bert Johnson. That suggests care and caution; yet, with this admonition in mind, we are firm in the belief that appellee fully established her case, and is entitled to recover.

VI. Appellants for reversal argue that, soon after the administrator was appointed for Mr. Johnson's estate, Mrs. Houlette appeared, and discussed the question of filing her claim, one item of which was approximately $2,400 for cash advanced for the benefit of Bert and his mother. Such was not necessarily an inconsistent position. First, she had no legal advice, and did not know just how to proceed to obtain her rights; and second, her obligation was "to remain in the home, do the housework, and care for decedent during the remainder of his life." This did not include the paying out of her own funds. Stipulation is to the effect that the reasonable value of the "property" involved is $3,500, subject, however, to a judgment lien on the foreclosure of a real estate mortgage, at the June, 1926, term of the district court of Linn County, in the sum of $732.30 and costs amounting to $52.11, with interest at 8 per cent, under which sale was had, July 22, 1926.

Unconscionable advantage does not appear. If all the equity is obtained by appellee, after satisfying said charge and

the costs of redemption, she will not be overpaid. Bert Johnson was survived by no wife and no children. There was nothing hindering him from entering upon this enterprise. It was assented to by appellee, and she is entitled to the fruits of her labor.

The judgment and decree of the district court should be, and hereby is, affirmed.—*Affirmed.*

EVANS, C. J., and STEVENS, DE GRAFF, and ALBERT, JJ., concur.