JENNIE E. STOLAR, Appellee, v. HANNAH L. TURNER, Appellant.

No. 46732.

594

FEBRUARY 5, 1946.

REHEARING DENIED MAY 10, 1946.

Carl H. Lambach, of Davenport, for appellant.

Miller, Miller & Cousins, of Clinton, for appellee.

MILLER, J.—Plaintiff's petition, in five counts, seeks to recover the proceeds of five policies of insurance on the life of

her father, John H. Turner; the policies had named her mother, Hannah L. Turner (defendant), as beneficiary but the right to change the beneficiary was reserved; thereafter the insured in writing changed the designation of beneficiary to plaintiff; insured died February 20, 1943, with the policies in full force and effect but with loans and interest chargeable thereto. The five counts of the petition were identical in form and content except for variant allegations as to numbers, dates, face amount of policies, and loans thereon. The prayer was for judgment in the aggregate sum of $14,999.16, with interest and costs.

The defendant Equitable Life Assurance Society of the United States filed answer, cross-petition, and interpleader in which it admitted liability for $14,999.16 on the five policies and averred its willingness to pay same into court but prayed that Hannah L. Turner be interpleaded as a claimant to the fund. The company paid $15,291.96 into court and plaintiff amended her petition, praying for judgment for said sum.

Defendant Hannah L. Turner filed answer, admitting the issuance of the policies and the designation of plaintiff as beneficiary therein and asserted: Prior to the issuance of the policies John H. Turner, husband of defendant, in consideration for defendant's joining in the execution of certain mortgages upon lands then owned by him, orally agreed that he would procure and maintain insurance in an amount of not less than $25,000; the insurance was procured pursuant to said agreement; the agreement further provided that defendant should be the beneficiary of said insurance without change or alteration; defendant contributed to and assisted in the payment of the premiums and the proceeds were bound by contract on the consideration stated when Turner purportedly executed an assignment thereof to plaintiff, who is a mere volunteer in the transaction, the proceeds being irrevocably pledged to the benefit of defendant; Turner purported to execute a request for change of beneficiary but was mentally incompetent and the purported request so made was null and void. The prayer was that defendant be awarded the fund paid into court by the insurance company.

Plaintiff's reply, as amended, denied that Turner made an agreement to maintain life-insurance policies payable to defend-

ant, denied that there was any consideration for such an agreement, denied that defendant paid any premiums on the insurance, denied that the proceeds were irrevocably pledged to defendant, denied that Turner was mentally incompetent when he changed the beneficiary of his insurance, and asserted that the mortgage which defendant signed was not signed at the insistence of her husband.

The plaintiff moved to transfer the issues presented by Division III of defendant's answer (relating to the alleged oral contract with the insured) to equity. This motion was sustained. Trial was had in equity on the issues presented by said Division III of the defendant's answer and plaintiff's reply thereto. At the conclusion thereof the court filed an opinion in which, among other things, doubt is expressed that any contract had been established but it is pointed out that the two vital propositions asserted by the answer were that defendant and her husband agreed:

"1st: Insurance in the amount of $25,000, of which Mrs. Turner was to be beneficiary was to be taken out, and 2nd: The beneficiary was not to be changed."

The court determined that there was no testimony on the second proposition by any of the witnesses and that such allegation is entirely without support in the record. The court stated:

"I have found no case, and have been referred to none, in which a claimant of the proceeds of insurance has been permitted to recover upon proof of less than is pleaded as the contract in the case at bar. As I have said before, I think I will let the Supreme Court do the legislating, if the rule is to be extended further than the Court has gone, so far. I find that the pleaded contract has not been established by Mrs. Turner, and as a legal conclusion I determine that Division III of her answer must be dismissed, at her costs."

Apparently the written opinion of the court was treated as its findings of fact and conclusions of law. Pursuant thereto, on October 21, 1944, it entered a decree which provided:

"Now on this 21st day of October, 1944, this same matter

comes on before the Court for entry of an order in conformity with said opinion, and it is hereby ordered that Division III of the answer of the interplead defendant Hannah Lucinda Turner, be and it is hereby dismissed.''

On November 18, 1944, defendant appealed from said decree. On December 13, 1944, the court entered judgment awarding the fund paid into court as aforesaid to plaintiff. In ruling upon plaintiff's motion to dismiss this appeal, we held, in Stolar v. Turner, 236 Iowa 628, 644, 645, 646, 19 N. W. 2d 585, 592, 593, that the decree appealed from was a final order within the contemplation of Rule 331(a) of the Rules of Civil Procedure and the motion to dismiss was overruled.

I. In seeking a reversal of this case at our hands defendant asserts three propositions: (1) She has established that John H. Turner agreed to secure $25,000 of life insurance on his life payable to her for her protection in consideration for her joining in the execution of notes and mortgages as pleaded. (2) It was an essential term of the contract expressed or implied that John H. Turner would not change the beneficiary. (3) She performed the consideration for John H. Turner's promise to her and thereafter he was precluded upon equitable considerations from undertaking to change the beneficiary in the policies irrespective of any specific promise not to change the beneficiary. In seeking an affirmance at our hands, plaintiff asserts four propositions: (1) There is no evidence to establish the essential term of the contract pleaded that John H. Turner could not change the beneficiary. (2) The making of the contract pleaded is not established by the evidence. (3) A sufficient consideration for the contract pleaded is not shown by the evidence. (4) The evidence fails to show that the insurance was procured pursuant to any contract. To decide such propositions it is necessary to carefully examine the evidence. It is quite voluminous, comprising nearly one hundred pages of the record. Obviously, we can do no more than refer to the essential facts which are controlling.

John H. and Hannah L. Turner were married October 23, 1901. He was then twenty-six and she was twenty-one. In 1902, John H. Turner, Jr., was born. In 1905, William Joseph Turner was born but he died in 1926, while a sophomore in

college. In 1908 Jennie Turner (Stolar), plaintiff herein, was born. In 1913 a fourth child was lost at birth. The family lived on a one-hundred-sixty-acre farm, three miles east of DeWitt, Iowa, which John H. Turner had inherited from his mother.

In 1901 Turner owed approximately $3,000. By the early part of 1918 his indebtedness had increased to about $20,000. At that time he bought another eighty-acre farm and borrowed $18,000 as the purchase price, making his total indebtedness about $38,000. Apparently, $30,000 of this indebtedness was secured by mortgages on the one-hundred-sixty- and eighty-acre tracts and the additional $8,000 was other indebtedness. A. M. Price, a witness for defendant, made the loans to Turner in 1918. The oral contract asserted by defendant herein is claimed to have been made during the negotiation of the loan of $18,000 for the purchase of the eighty acres.

Mrs. Turner testified concerning the alleged oral contract as follows:

"Mr. Turner wanted to buy that 80 and wanted to know what I thought about it. * * * I told him I could not see it. I said we were in debt $10,000 and that would mean more worry and more work, a bigger debt. I told him I did not see any use of having any more land and I said, if anything happened to him before it did me I probably would lose my home and everything I had. * * * When I told Mr. Turner I objected to buying the 80 we talked it [over] quite a bit. He came to me and said he wanted it and little Bill, our boy that is dead now, he must have been twelve or thirteen I should judge, and he wanted it awfully bad; he said he had a suggestion, if he bought life insurance to protect me—The price of the land was $235.00 an acre. He said if he would take out life insurance to protect me and wondered if it would be all right; of course, I didn't want to be too mean; I wasn't very anxious about buying it; then he said he would take out life insurance and protect me. We had that agreement. I told him we better go up and talk to Mr. Price and we did; we went up several times. At that time he had no money whatsoever to pay for the land. We had to borrow the whole purchase price. * * *

We talked it over with Mr. Price. Mr. Price knew I objected to buying the 80. I told him I did not want to buy it. I told him it would put us too much in debt and I didn't like the debt. * * * Q. In any event, in spite of your objections you finally did sign whatever papers were required to make a loan to buy it, didn't you? A. Yes. * * * Q. In the words that he used, just how he expressed himself, as near as you can, either exactly or in substance of what he said; not that he agreed, but what did he tell you? A. He said he would take out insurance to protect me. Mr. Turner asked me if I would agree to buy the 80 [if] he would buy insurance to protect me. He always talked about $25,000. That would cover the indebtedness. We were borrowing an additional $18,000 to buy the 80. It seems to me he borrowed a little more. I am not sure about that. There were two mortgages for $30,000. * * * After he bought the 80 I signed the mortgages and the notes."

Mr. Price testified for defendant as follows:

"Q. What was said at that conversation in the presence of Mr. Turner, Mrs. Turner and yourself in regard to the purchase of this property; if anything was said, * * * A. She was opposed to it on the ground—that is, opposed to the purchase of the 80 on the ground that it would put them too much in debt. * * * She said she did not want to purchase the 80 acres because it would involve them too much more in debt and there was plenty of debt then. Mr. Turner said he would take out a policy of $25,000 of life insurance payable to her in the event of his death to relieve her of so much indebtedness. She said she would agree to the purchase under those conditions. * * * He was still insisting upon the purchase of the 80 acres and finally she agreed to the purchase. Said she would provided he would take out that $25,000 life insurance policy in her favor. He said he would. * * * I took a mortgage for the North 160. I loaned him $18,000 to buy the 80. In the early part of 1918. * * * Q. Then in the early part of the year 1918 you took mortgages for a total of $38,-000.00, and that increased the mortgage on the 160 by $10,-000.00, didn't it? A. It would."

Turner had difficulty securing insurance because of fam-

600

ily history of tuberculosis. In 1913 or 1914 he was rejected on that ground. Plaintiff testified:

"It was always a known fact in the family that Dad couldn't get life insurance. He had been rejected before 1920."

Mrs. Turner testified:

"Mr. Turner's health was very good. He tried to get insurance through Mr. Mathews and John Carlsen. Mr. Carlsen wrote up the boys and Mr. Turner thought by taking the boys and taking him, he could get in that way. He was rejected. It was not his health. It was the family history T-B. I think the statement that if he attained the age of fifty-five and was in good health he could get insurance was from Mr. Van Epps. * * * After 1920 every time I had to renew a mortgage or sign a note, he made the remark to me he didn't get his insurance, but he was not going to give up. He knew he would be able to get it later on and would still live up· to his agreement with me."

In 1921 Turner applied for a policy of life insurance for $5,000, with Mrs. Turner as beneficiary, through J. J. Mathews, agent for the New York Life Insurance Company. The company rejected it because of the family history of tuberculosis. No further attempt was made with Mathews.

On January 15, 1929, four of the five policies of life insurance involved herein were issued, for the sums of $5,000, $5,000, $5,000, and $3,000, with Mrs. Turner named as beneficiary. On February 11, 1929, the fifth policy was issued for $7,000, with the First National Bank of DeWitt named as beneficiary. All five policies were issued, "with the right to the Insured to change the beneficiary or assign this policy." The First National Bank did not then hold any of. the mortgages on the farms but Turner owed other debts to it. Ray McDevitt, who did not testify for either side, was the agent that represented the insurance company.

Plaintiff testified concerning the transaction as follows:

"I remember Ray McDevitt being out to solicit Father for insurance during Christmas vacation, the latter part of 1928 and first part of January 1929. I heard a conversation

between my father and Mr. McDevitt. My mother was present. She took part in it. I believe my father applied for $10,000. My mother was always opposed to spending, incurring extra debts. Q. What did she say, if anything, at this time about your father's ability to carry those premiums? A. Well, on the full twenty-five that he finally took, she objected strenuously. Ray McDevitt made several trips out there and each time he came she bawled him out for coming and told him he was a pest and had a lot of nerve thinking Dad would carry that much life insurance. Dad applied for the $10,000 and when Ray ordered the insurance he ordered an additional $15,000 and Dad wasn't even sure he could pass the physical; he told Ray he didn't think he could get insurance at all because of his family t-b history and his heart condition and when Ray brought the $15,000 Dad didn't want it and somehow they argued back and forth and discussed it and Ray said part of it could be made payable to the bank because Dad was heavily indebted to them. Ray gave 50% of his first premium that would be his commission to induce my father to take it. Ray said he would pay that, if my father would take the whole thing. * * * Q. And do you know what kind of insurance he applied for in the five-thousand dollar policies? A. Well, he was interested in the double indemnity and the disability clauses; that was Ray's selling point. * * * Ever since Ray McDevitt paid the death benefit on Bill's policy, he was after Dad to let him write him a policy of insurance; that was way back in 1926; Dad held him off until 1929; then Dad finally said if you can get $10,000 and I can pass a physical, I will take it; then this additional came up when Ray found Dad was interested. * * * My mother was around. She objected to the extra insurance. Said he would never be able to pay the premiums.''

Defendant testified in rebuttal as follows:

''I did not object to my husband taking the insurance. I might have remarked it was quite a little bit of money to keep up, but I didn't object. * * * Q. What was your wish and desire as to your husband procuring the $25,000? * * * A. Well, we were in debt on the farm so heavily we thought if we would

lose the farm we would have the life insurance to fall back on. * * * Q. And what, if anything, did he say about the insurance when he had gotten it? A. Well, he was very well pleased and he says, 'I have certainly carried out my agreement with you when we bought the 80.' ''

Ralph Waterbury, as a witness for defendant, testified as follows:

''I remember two times in particular when I talked to John H. Turner about insurance. Once was after he had obtained $25,000.00 of insurance and he talked to me about it and asked what I thought about it, and I told him I thought it was too much and that the premium was too heavy for his income, and I asked him what the idea was carrying so much and he said it was to take care of his indebtedness or it was on account of his indebtedness. That was fairly close to the time when he had gotten the insurance. He stated he was very heavily involved and he elaborated that to the extent that there was a heavy mortgage on the farm, and also a chattel mortgage. He stated it was payable to his wife, Hannah.''

The applications were for term insurance but the company declined to issue such insurance and all five policies were ordinary life policies. They provided for waiver of premiums and disability benefits in the event of total disability. In 1932 Turner was injured, lost an arm, became totally disabled. He and his wife moved off the farm and rented it to their son, John, Jr. The insurance company thereafter waived the premiums on the insurance and paid him disability benefits at the rate of $250 per month.

In 1931 Turner signed a letter to the First National Bank, which defendant witnessed, agreeing not to change the beneficiary in the $7,000 policy as long as the indebtedness to the bank was unpaid and designating that any balance be paid defendant. In 1932 the Farmers & Citizens Savings Bank was made beneficiary of one of the $5,000 policies. In 1935 defendant was made beneficiary of the $7,000 policy instead of the First National Bank and in 1939 she was made beneficiary of the $5,000 policy instead of the Farmers & Citizens Savings Bank.

Defendant and her husband separated in July 1941. She described their separation thus:

"Mr. Turner left me the latter part of July 1941. I stayed there six weeks and three days. He did not come back so I just went over to my son and stayed there on the 160. Our difficulty arose over our son John concerning the question of his being refused the privilege of renting the farm. I wished him, John, to continue there and my husband refused to permit it. This finally culminated in a suit for separate maintenance in which I was unsuccessful. John left the farm in 1942 and I went with him. I lived with him on a farm up in Delaware County. My husband died about a year after that."

Defendant's action for separate maintenance was commenced September 18, 1941. During its pendency, on October 4, 1941, the five policies were made payable to insured's daughter, plaintiff herein, as beneficiary. As stated by defendant, the action for separate maintenance was tried and resulted in a decree of dismissal. Defendant and her husband did not live together again after their separation in 1941. On January 23, 1942, Turner executed a will that devised to defendant, if living and not divorced, $500; to John Turner, Jr., $500; to William Joseph Turner, a grandson, $4,000; to Shirley Ann Turner, a granddaughter, $1,000; to Janice May Turner, a granddaughter, $1,000; and the residue to Jennie Stolar (plaintiff herein) and William Joseph Turner, share and share alike. The latter two were nominated as executrix and executor of the estate. The property of the estate, both real and personal, was ordered sold to pay the legacies. Defendant, as widow, elected not to take under the will. She received a widow's allowance of $1,200 and her distributive share was estimated to be approximately $10,000.

Certain letters written by defendant to the insurance company were introduced in evidence by her. On March 10, 1943, she wrote the company as follows:

"This is to inform you that my husband who had these Policies with your company died on February 20, 1943, at the Jane Lamb hospital Clinton, Iowa. As I was the beneficiary

named on these policies, I would appreciate it if you would send me the proper papers so that this claim may be taken care of at once. I realize that we had some loans on these Policies as have papers showing the amount of loans. If there are any irregularities on the Policies as to beneficiary I will say that my husband has been both mentally and physically deranged the last 18 months. May I hear from you by return mail.''

On March 25, 1943, she wrote the company as follows:

''Ever since the policies were taken out I was the beneficiary of the above numbered policies with the exception of the First National Bank & Farmers & Citizens Bank of DeWitt, Iowa. After we got them paid off the insured designated me as beneficiary. My husband and I always had the mutual understanding that if he went before I did I was to pay off the mortgage on the farm with the life insurance claim. Since July of 1941 my husband has changed mentally. I am sorry this had to happen. At different times some of the neighbors wanted to get a petition out and have him examined and a guardian placed over him. I always asked them to let it go for a while in hopes that things would be better. I do not want to hire a lawyer if I can help it. Therefore I wish you folks would tell me what procedure you want me to follow in order that I may have the insurance money placed on the farm mortgage. If there is a hereafter I hope there is and I believe there is, and I think and hope my husband is up there with the Angels and if he could be on this earth for just a minute in his normal mind he would say, 'Put the insurance money on the farm debt.' ''

Although in both of the letters, last quoted above, defendant asserted that her husband was mentally incompetent when he undertook to change the designation of the beneficiary to plaintiff, and a similar allegation was asserted in Division IV of the answer as above stated, no evidence was offered to establish such claim and no contention to that effect is presented to us. In the answer, defendant also asserted that she had paid some of the premiums on the policies but no evidence to sustain that allegation was introduced and no claim is made here that any premiums were paid by her.

II. The rule is well established that, where the insured reserved the right to change the beneficiary, the beneficiary does not have a vested interest in the insurance. In the case of Potter v. Northwestern Mut. L. Ins. Co., 216 Iowa 799, 804, 247 N. W. 669, 671, after an extensive review of the authorities, we stated:

"Under the foregoing rule, which seems to be well established, where the right to change the beneficiary has been reserved in the policy, the beneficiary does not have a vested right or interest, and the insured has complete control and domination of the policy; that his reserved right to change the beneficiary includes the lesser right to affect the rights of the beneficiary by exercising or creating a lien on the policy; and thus he may do directly what he might do by changing the beneficiary to himself or his estate."

We have held that, where the beneficiary is named pursuant to a contract for a valuable consideration, the circumstances may be such that the beneficiary may acquire a vested interest in the insurance so that the insured will be without power to change the designation of beneficiary. Cases so holding include: Jacobson v. New York L. Ins. Co., 199 Iowa 770, 202 N. W. 578; Beed v. Beed, 207 Iowa 954, 222 N. W. 442; Aetna L. Ins. Co. v. Morlan, 221 Iowa 110, 264 N. W. 58; In re Estate of Paul, 231 Iowa 1078, 3 N. W. 2d 186. Cases in which such a contract was claimed to have been made but this court determined that the beneficiary had not met the burden of proof include: Herriman v. McKee, 49 Iowa 185; In re Estate of Donaldson, 126 Iowa 174, 101 N. W. 870; Bennett v. Union Central L. Ins. Co., 220 Iowa 927, 263 N. W. 25; In re Estate of Hazeldine, 225 Iowa 369, 280 N. W. 568; Shepherd v. Pacific Mut. L. Ins. Co., 230 Iowa 1304, 300 N. W. 556. In the case of Sovereign Camp W.O.W. v. Russell, 214 Iowa 39, 241 N. W. 395, such a contract was held to be unenforceable because of a special statute relative to fraternal societies.

In this case defendant pleads and relies upon an oral contract and the cause was tried in equity. In the above cases, where an oral contract was relied upon and the case was tried in equity, we have repeatedly held that the oral contract must

be established by clear, satisfactory, and convincing proof. The rule is analogous to that generally followed in cases where one relies upon an oral contract in reference to the disposition of the property of one deceased. Many of the cases announcing that general rule are collected by Judge Bliss in the case of Williams v. Harrison, 228 Iowa 715, 723, 293 N. W. 41. Defendant does not challenge this rule but asserts that her contract has been established "by clear and convincing evidence." Plaintiff, of course, claims that the evidence thereof is not clear, satisfactory, or convincing.

III. As has been heretofore noted, the trial court determined that the essential part of defendant's alleged contract, which provided that the beneficiary should not be changed, was without support in the evidence. Counsel for defendant tacitly concedes that there is no evidence that the insured expressly stated, as a part of the oral contract, that the beneficiary would not be changed. Counsel contends that that was not necessary because (1) an essential term of the contract, express or implied, was that Turner would not change the beneficiary, or (2) Turner was precluded upon equitable considerations from undertaking to change the beneficiary, irrespective of any specific promise not to do so. Counsel for plaintiff contend that these propositions were not pleaded, were not raised below, and cannot be raised for the first time on appeal to this court.

Of course, it is well established that, though an equity case is tried de novo in this court, the appellant cannot try it here on a new theory that was not advanced in the trial court. New Amsterdam Cas. Co. v. Bookhart, 212 Iowa 994, 1001, 235 N. W. 74, 76 A. L. R. 897. Obviously, we can consider only those issues that were raised by the pleadings below. Defendant's answer asserted:

"* * * in consideration of her executing and joining in the execution of various mortgages upon the lands then owned by John H. Turner, [he] orally agreed that he would procure and maintain until his death insurance in an amount not less than $25,000.00. That the insurance herein, the subject matter of this action, was the insurance procured pursuant to said

agreement. That said agreement further provided that this defendant should be and remain without change or alteration the beneficiary thereof.''

These allegations asserted an express contract not to change the beneficiary.

Since it is conceded that express words to that effect have not been proved, the only issue properly before us is whether such a provision was implicit from the conversations of the parties upon which the oral contract is predicated. We agree with the trial court that, to sustain defendant's contention thereon, it would be necessary to go further than any of our decisions to date has gone on this question.

In the case of Jacobson v. New York L. Ins. Co., supra, it is pointed out, at page 771 of 199 Iowa, page 579 of 202 N. W., that the insured said, ''This is for your protection. You keep up the premiums on it, and I will never change it.'' This was an express promise not to change the beneficiary and the beneficiary was to pay the premiums. We have no evidence of such an express promise herein. In the other three cases that have denied the right of the insured to change the beneficiary, there was no such clear-cut promise not to change the beneficiary as in the Jacobson case, supra. If, as defendant contends, such a promise was implicit in the transaction, the facts in those cases were brought into much clearer focus than are those now before us.

In the case of Bennett v. Union Cent. L. Ins. Co., supra, at page 932 of 220 Iowa, page 27 of 263 N. W., we quoted from the Beed case, supra, the statement of the rule applied by it, as follows:

'' 'But there is an exception to this general rule where, as in the instant case, the policy is taken out for and in behalf of a beneficiary for a specific purpose, either under an agreement between the parties that the beneficiary shall not be changed, or under such circumstances as to render it inequitable to permit such change to be made.' ''

The opinion in the Bennett case then states:

"While this statement of the exception seems to recognize that it may exist, either under an agreement between the parties that the beneficiary shall not be changed, or under such circumstances as render it inequitable to permit such change to be made, it seems to confine the exception to cases where the insurance is taken out for and in behalf of the beneficiary for a specific purpose."

In that case the proceeds had been paid by the insurance company to the later-designated beneficiary. It was not a contest between two claimants to the fund paid into court as was done herein. Recovery was sought against the company, to require it to pay the proceeds a second time, and was denied because the company had no knowledge of the alleged contract. We think that the statement is accurate that, in the absence of a specific promise not to change the beneficiary, such a promise is implied but only to accomplish the specific purpose the insured had in mind. At least, in the cases heretofore decided by us, such has been the purpose of the rule that we have developed.

In the Beed case, supra, the specific purpose that the rule permitted to be accomplished was to afford the insured's brother security against loss by reason of his becoming surety for the insured on a new note for $5,000. The policy of insurance was issued simultaneously with the agreement and was delivered to the bank as security for the brother's liability as surety on the note. In the Morlan case, supra, Mrs. Dutton was named beneficiary in the policy simultaneously with the making of the agreement, and the specific purpose was to afford her security for $4,750 previously advanced, $500 advanced at the time of the change of beneficiary, $1,000 subsequently loaned, and the agreement made at that time to furnish support in the future to the parents of insured. In the Paul case, supra, the beneficiary was changed to insured's estate and all parties had the view that, by so doing, the proceeds of the insurance would be available to pay insured's debts; such would be the law only by reason of a binding agreement; relying on an oral contract, a doctor and a funeral director agreed to and did furnish services and the landlord furnished support to the insured and the policy was delivered to the banker under the belief that he

became trustee of it for the benefit of such creditors of the insured. In each case there was a specific purpose to be accomplished, the evidence thereof was clear, satisfactory, and convincing, and the decision of this court, in each instance, had the effect of accomplishing that specific and well-defined purpose.

But we have no such situation here. The consideration asserted for the oral contract was the defendant's reluctant joining in the execution of notes and mortgages to secure a loan of $18,000 to buy an eighty-acre farm. If defendant had pleaded that the specific purpose of the oral contract was to protect her from loss by reason of the $18,000 loan, the situation would be somewhat analogous to the Beed, Morlan, and Paul cases. Some of the testimony would imply that such may have been the purpose. Mrs. Turner's letter to the company on March 25, 1943, stated:

"My husband and I always had the mutual understanding that if he went before I did I was to pay off the mortgage on the farm with the life insurance * * * I wish you folks would tell me what procedure you want me to follow in order that 1 may have the insurance money placed on the farm mortgage."

Ralph Waterbury testified that Turner told him that he carried the insurance on account of his indebtedness. Mr. Price testified that, "Mr. Turner said he would take out a policy of $25,000 of life insurance payable to her in the event of his death to relieve her of so much indebtedness." Mrs. Turner testified, "He always talked about $25,000. That would cover the indebtedness." But the specific purpose that defendant here pleads and seeks to accomplish is not to have the insurance proceeds used to pay the indebtedness but to have them paid to her to be used by her for her own purposes. She is not so interested now in paying the mortgages on the farms, which, at the time of the decedent's death had been reduced from $30,000 to approximately $15,000, because the farms were not left to her and her distributive share is only one third of the estate. She would benefit by such action only to the extent of one third of the proceeds. By her answer she demands all

610

the proceeds of the insurance for her own purposes. In the cases heretofore decided by us, the purpose of the litigation was to have the proceeds of the insurance applied upon specific indebtedness. We adopted a rule of law that would accomplish such specific purpose in each case. That rule of law does not fit the case here pleaded because the specific purpose of the litigation is not analogous.

The trial court was impressed with the fact that the oral conversations did not clearly show the terms of any contract. In its written opinion the court stated:

"It is undoubtedly true that, notwithstanding the numerous abortive agreements, a contractual agreement in relation to the procurement of insurance and the execution of the necessary documents could have been made, but the fact that five or six agreements were entered into in relation to the matter indicates rather strongly, if not conclusively, that the discussions were argumentative rather than contractual."

There are other factors that were conspicuous in our decided cases which do not stand forth with any such clarity in the record herein. In each of our former cases the insurance was taken out or the designation of beneficiary changed simultaneously with the making of the oral agreement and it was unmistakable that the specific insurance involved was identified with the oral contract. We have no such record here. This insurance was not taken out until eleven years after the oral contract is claimed to have been made. In 1918, when insured bought the eighty acres, he was uninsurable. He had been rejected in 1913 or 1914. That fact was well known. When he applied for insurance in 1920 or 1921, he was again rejected. And he applied for $5,000, not $25,000, of insurance. When he applied for insurance in 1929 it was for $10,000, not $25,000. The agent induced him to take $25,000 by waiving his original commission. Plaintiff testifies that her father was mostly interested in disability benefits. As matters turned out, the insurance was primarily for his own benefit. By paying but three years' premiums, he received disability benefits of approximately $30,000 and loans on the insurance of such sums as, with interest, approximated $10,000. The retention of the right to

change the beneficiary was important to the insured in that it permitted him to freely borrow on it.or pledge the insurance as security for numerous loans. See the Potter case, supra, heretofore quoted from.

Counsel for defendant stresses the fact that the parties had in mind $25,000 and the insurance was in the sum of $25,000. But, as an actual fact, defendant at no time was the beneficiary of $25,000 of insurance in a real sense of the word. From 1929 to 1932 she was the beneficiary of policies in the face amount of $18,000 and the First National Bank for $7,000; from 1932 to 1935 defendant was beneficiary of policies of the face amount of $13,000, the First National Bank of $7,000, the Farmers & Citizens Savings Bank of $5,000; from 1935 to 1939 defendant was beneficiary of policies of the face amount of $20,000 and the Farmers & Citizens Savings Bank of $5,000. When finally in 1939 defendant became beneficiary of all five policies of the face amount of $25,000, there were substantial loans thereon that reduced the actual insurance considerably below that figure.

Defendant pleaded below and here contends that plaintiff is a mere volunteer. We do not so consider her. Section 8776, Code, 1939, provides as follows:

"A policy of insurance on the life of an individual, in the absence of an agreement or assignment to the contrary, shall inure to the separate use of the husband or wife and children of said individual, independently of his creditors."

Under this statute the spouse and the children are placed in the preferred class. Both plaintiff and defendant were members of the preferred class. The regrettable family quarrel, which appears to have been the basic cause of the present controversy, aligned Turner and plaintiff on one side and defendant and the son, John, Jr., on the other. Turner could determine for himself, in the absence of a binding agreement or assignment, which members of the preferred class of beneficiaries should be the subject of his bounty.

Plaintiff urges upon us as being applicable herein the statement made in In re Estate of Hazeldine, supra, at pages 382 and 383 of 225 Iowa, page 575 of 280 N. W., to wit:

"It is our opinion that, considering all the evidence, its meagerness in regard to essential matters and the inconsistencies revealed therein, it is insufficient to establish the oral contract upon which the appellant relies, in that clear, satisfactory and convincing manner that such contracts must be established when claimed to have been made with a person since deceased. In re Estate of Donaldson, 126 Iowa 174, 101 N. W. 870; Herriman v. McKee, 49 Iowa 185; Groh v. Miller, 196 Iowa 1367, 195 N. W. 259; Helmers v. Brand, 203 Iowa 587, 213 N. W. 384; Houlette v. Johnson, 205 Iowa 687, 216 N. W. 679; Glissman v. McDonald, 128 Neb. 693, 260 N. W. 182."

Here the defendant alleged that the insured was mentally incompetent to change the designation of beneficiary of his insurance but no proof is offered thereon. She alleged that she paid part of the premiums but there is no proof thereon. She alleged an express promise not to change the beneficiary but produced no evidence of a direct statement thereon and now contends that such a promise was implicit in the transaction: She, of course, had the burden of proof. Without further elaboration, we are of the opinion and hold that the essential provision of the alleged oral contract with the decedent herein that he should be powerless to change the beneficiary in the life-insurance policies has not been established in the clear, satisfactory, and convincing manner that such contracts must be established when claimed to have been made with a person since deceased, and that the trial court's decision to that effect was correct.

The cause is—Affirmed.

All JUSTICES concur.

---

Beginning with cases filed in JUNE we cite the Code of 1946, even though it was not published until after the cases had been tried below and submitted to this court.